Justice KENNEDY delivered the opinion of the Court, except as to Part II-B.*
*569 The Court must decide whether the town of Greece, New York, imposes an impermissible establishment of religion by *570 opening its monthly board meetings with a prayer. It must be concluded, consistent with the Court's opinion in Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), that no violation of the Constitution has been shown. *1816 I
Greece, a town with a population of 94,000, is in upstate New York. For some years, it began its monthly town board meetings with a moment of silence. In 1999, the newly elected town supervisor, John Auberger, decided to replicate the prayer practice he had found meaningful while serving in the county legislature. Following the roll call and recitation of the Pledge of Allegiance, Auberger would invite a local clergyman to the front of the room to deliver an invocation. After the prayer, Auberger would thank the minister for serving as the board's "chaplain for the month" and present him with a commemorative plaque. The prayer was intended to place town board members in a solemn and deliberative frame of mind, invoke divine guidance in town affairs, and follow a tradition practiced by Congress and dozens of state legislatures. App. 22a-25a.
*571 The town followed an informal method for selecting prayer givers, all of whom were unpaid volunteers. A town employee would call the congregations listed in a local directory until she found a minister available for that month's meeting. The town eventually compiled a list of willing "board chaplains" who had accepted invitations and agreed to return in the future. The town at no point excluded or denied an opportunity to a would-be prayer giver. Its leaders maintained that a minister or layperson of any persuasion, including an atheist, could give the invocation. But nearly all of the congregations in town were Christian; and from 1999 to 2007, all of the participating ministers were too.
Greece neither reviewed the prayers in advance of the meetings nor provided guidance as to their tone or content, in the belief that exercising any degree of control over the prayers would infringe both the free exercise and speech rights of the ministers. Id., at 22a. The town instead left the guest clergy free to compose their own devotions. The resulting prayers often sounded both civic and religious themes. Typical were invocations that asked the divinity to abide at the meeting and bestow blessings on the community:
*572 "Lord we ask you to send your spirit of servanthood upon all of us gathered here this evening to do your work for the benefit of all in our community. We ask you to bless our elected and appointed officials so they may deliberate with wisdom and act with courage. Bless the members of our community who come here to speak before the board so they may state their cause with honesty and humility.... Lord we ask you to bless us all, that everything we do here tonight will move you to welcome us one day into your kingdom as good and faithful servants. We ask this in the name of our brother Jesus. Amen." Id., at 45a.
Some of the ministers spoke in a distinctly Christian idiom; and a minority invoked religious holidays, scripture, or doctrine, as in the following prayer:
"Lord, God of all creation, we give you thanks and praise for your presence and action in the world. We look with anticipation to the celebration of Holy Week and Easter. It is in the solemn events of next week that we find the very heart and center of our Christian faith. We acknowledge the saving sacrifice of Jesus Christ on the cross. We draw strength, vitality, and confidence from his resurrection at Easter.... We pray for peace in the world, an end to terrorism, violence, conflict, and war. We pray for stability, democracy, and good government in those countries in which our armed forces are now serving, especially in Iraq and Afghanistan.... Praise and glory be yours, O Lord, now *1817 and forever more. Amen." Id., at 88a-89a.
Respondents Susan Galloway and Linda Stephens attended town board meetings to speak about issues of local concern, and they objected that the prayers violated their religious or philosophical views. At one meeting, Galloway admonished board members that she found the prayers "offensive," "intolerable," and an affront to a "diverse community." Complaint in No. 08-cv-6088 (WDNY), ¶ 66. After respondents complained that Christian themes pervaded the prayers, to the exclusion of citizens who did not share those beliefs, the town invited a Jewish layman and the chairman of the local Baha'i temple to deliver prayers. A Wiccan priestess who had read press reports about the prayer controversy requested, and was granted, an opportunity to give the invocation.
Galloway and Stephens brought suit in the United States District Court for the Western District of New York. They alleged that the town violated the First Amendment's Establishment Clause by preferring Christians over other prayer givers and by sponsoring sectarian prayers, such as those given "in Jesus' name." 732 F.Supp.2d 195, 203 (2010). They did not seek an end to the prayer practice, but rather requested an injunction that would limit the town to "inclusive *573 and ecumenical" prayers that referred only to a "generic God" and would not associate the government with any one faith or belief. Id., at 210, 241.
The District Court on summary judgment upheld the prayer practice as consistent with the First Amendment. It found no impermissible preference for Christianity, noting that the town had opened the prayer program to all creeds and excluded none. Although most of the prayer givers were Christian, this fact reflected only the predominantly Christian identity of the town's congregations, rather than an official policy or practice of discriminating against minority faiths. The District Court found no authority for the proposition that the First Amendment required Greece to invite clergy from congregations beyond its borders in order to achieve a minimum level of religious diversity.
The District Court also rejected the theory that legislative prayer must be nonsectarian. The court began its inquiry with the opinion in Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, which permitted prayer in state legislatures by a chaplain paid from the public purse, so long as the prayer opportunity was not "exploited to proselytize or advance any one, or to disparage any other, faith or belief," id., at 794-795, 103 S.Ct. 3330. With respect to the prayer in Greece, the District Court concluded that references to Jesus, and the occasional request that the audience stand for the prayer, did not amount to impermissible proselytizing. It located in Marsh no additional requirement that the prayers be purged of sectarian content. In this regard the court quoted recent invocations offered in the U.S. House of Representatives "in the name of our Lord Jesus Christ," e.g., 156 Cong Rec. H5205 (June 30, 2010), and situated prayer in this context as part a long tradition. Finally, the trial court noted this Court's statement in County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter, 492 U.S. 573, 603, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), that the prayers in Marsh did not offend the Establishment Clause "because the particular chaplain had 'removed all references to *574 Christ.' " But the District Court did not read that statement to mandate that legislative prayer be nonsectarian, at least in circumstances where the town permitted clergy from a variety of faiths to give invocations. By welcoming many viewpoints, the District *1818 Court concluded, the town would be unlikely to give the impression that it was affiliating itself with any one religion.
The Court of Appeals for the Second Circuit reversed. 681 F.3d 20, 34 (2012). It held that some aspects of the prayer program, viewed in their totality by a reasonable observer, conveyed the message that Greece was endorsing Christianity. The town's failure to promote the prayer opportunity to the public, or to invite ministers from congregations outside the town limits, all but "ensured a Christian viewpoint." Id., at 30-31. Although the court found no inherent problem in the sectarian content of the prayers, it concluded that the "steady drumbeat" of Christian prayer, unbroken by invocations from other faith traditions, tended to affiliate the town with Christianity. Id., at 32. Finally, the court found it relevant that guest clergy sometimes spoke on behalf of all present at the meeting, as by saying "let us pray," or by asking audience members to stand and bow their heads: "The invitation ... to participate in the prayer ... placed audience members who are nonreligious or adherents of non-Christian religion in the awkward position of either participating in prayers invoking beliefs they did not share or appearing to show disrespect for the invocation." Ibid. That board members bowed their heads or made the sign of the cross further conveyed the message that the town endorsed Christianity. The Court of Appeals emphasized that it was the "interaction of the facts present in this case," rather than any single element, that rendered the prayer unconstitutional. Id., at 33.
Having granted certiorari to decide whether the town's prayer practice violates the Establishment Clause, *575 569 U.S. ----, 133 S.Ct. 2388, 185 L.Ed.2d 1103 (2013), the Court now reverses the judgment of the Court of Appeals.
II
In Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, the Court found no First Amendment violation in the Nebraska Legislature's practice of opening its sessions with a prayer delivered by a chaplain paid from state funds. The decision concluded that legislative prayer, while religious in nature, has long been understood as compatible with the Establishment Clause. As practiced by Congress since the framing of the Constitution, legislative prayer lends gravity to public business, reminds lawmakers to transcend petty differences in pursuit of a higher purpose, and expresses a common aspiration to a just and peaceful society. See Lynch v. Donnelly, 465 U.S. 668, 693, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring); cf. A. Adams & C. Emmerich, A Nation Dedicated to Religious Liberty 83 (1990). The Court has considered this symbolic expression to be a "tolerable acknowledgement of beliefs widely held," Marsh, 463 U.S., at 792, 103 S.Ct. 3330, rather than a first, treacherous step towards establishment of a state church.
Marsh is sometimes described as "carving out an exception" to the Court's Establishment Clause jurisprudence, because it sustained legislative prayer without subjecting the practice to "any of the formal 'tests' that have traditionally structured" this inquiry. Id., at 796, 813, 103 S.Ct. 3330 (Brennan, J., dissenting). The Court in Marsh found those tests unnecessary because history supported the conclusion that legislative invocations are compatible with the Establishment Clause. The First Congress made it an early item of business to appoint and pay official chaplains, and both the House and Senate have maintained the office virtually uninterrupted since that time. See id., at 787-789, and n. 10, 103 S.Ct. 3330; N. Feldman, Divided *1819 by God 109 (2005). But see Marsh, supra, at 791-792, and n. 12, 103 S.Ct. 3330 (noting dissenting views among the Framers); Madison, "Detached Memoranda", 3 Wm. & Mary *576 Quarterly 534, 558-559 (1946) (hereinafter Madison's Detached Memoranda). When Marsh was decided, in 1983, legislative prayer had persisted in the Nebraska Legislature for more than a century, and the majority of the other States also had the same, consistent practice. 463 U.S., at 788-790, and n. 11, 103 S.Ct. 3330. Although no information has been cited by the parties to indicate how many local legislative bodies open their meetings with prayer, this practice too has historical precedent. See Reports of Proceedings of the City Council of Boston for the Year Commencing Jan. 1, 1909, and Ending Feb. 5, 1910, pp. 1-2 (1910) (Rev. Arthur Little) ("And now we desire to invoke Thy presence, Thy blessing, and Thy guidance upon those who are gathered here this morning ..."). "In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with a prayer has become part of the fabric of our society." Marsh, supra, at 792, 103 S.Ct. 3330.
Yet Marsh must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation. The case teaches instead that the Establishment Clause must be interpreted "by reference to historical practices and understandings." County of Allegheny, 492 U.S., at 670, 109 S.Ct. 3086 (KENNEDY, J., concurring in judgment in part and dissenting in part). That the First Congress provided for the appointment of chaplains only days after approving language for the First Amendment demonstrates that the Framers considered legislative prayer a benign acknowledgment of religion's role in society. D. Currie, The Constitution in Congress: The Federalist Period 1789-1801, pp. 12-13 (1997). In the 1850's, the judiciary committees in both the House and Senate reevaluated the practice of official chaplaincies after receiving petitions to abolish the office. The committees concluded that the office posed no threat of an establishment because lawmakers were not compelled to attend the daily prayer, S.Rep. No. 376, 32d Cong., 2d Sess., 2 (1853); no faith was excluded by law, nor any favored, *577 id., at 3; and the cost of the chaplain's salary imposed a vanishingly small burden on taxpayers, H. Rep. No. 124, 33d Cong., 1st Sess., 6 (1854). Marsh stands for the proposition that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted. Any test the Court adopts must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change. County of Allegheny, supra, at 670, 109 S.Ct. 3086 (opinion of KENNEDY, J.); see also School Dist. of Abington Township v. Schempp, 374 U.S. 203, 294, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring) ("[T]he line we must draw between the permissible and the impermissible is one which accords with history and faithfully reflects the understanding of the Founding Fathers"). A test that would sweep away what has so long been settled would create new controversy and begin anew the very divisions along religious lines that the Establishment Clause seeks to prevent. See Van Orden v. Perry, 545 U.S. 677, 702-704, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005) (BREYER, J., concurring in judgment).
The Court's inquiry, then, must be to determine whether the prayer practice in the town of Greece fits within the tradition long followed in Congress and the state legislatures. Respondents assert that the *1820 town's prayer exercise falls outside that tradition and transgresses the Establishment Clause for two independent but mutually reinforcing reasons. First, they argue that Marsh did not approve prayers containing sectarian language or themes, such as the prayers offered in Greece that referred to the "death, resurrection, and ascension of the Savior Jesus Christ," App. 129a, and the "saving sacrifice of Jesus Christ on the cross," id., at 88a. Second, they argue that the setting and conduct of the town board meetings create social pressures that force nonadherents to remain in the room or even feign participation in order to avoid offending the representatives who sponsor the prayer and will vote on matters citizens bring before the board. The sectarian content of the prayers compounds the *578 subtle coercive pressures, they argue, because the nonbeliever who might tolerate ecumenical prayer is forced to do the same for prayer that might be inimical to his or her beliefs.
A
Respondents maintain that prayer must be nonsectarian, or not identifiable with any one religion; and they fault the town for permitting guest chaplains to deliver prayers that "use overtly Christian terms" or "invoke specifics of Christian theology." Brief for Respondents 20. A prayer is fitting for the public sphere, in their view, only if it contains the " 'most general, nonsectarian reference to God,' " id., at 33 (quoting M. Meyerson, Endowed by Our Creator: The Birth of Religious Freedom in America 11-12 (2012)), and eschews mention of doctrines associated with any one faith, Brief for Respondents 32-33. They argue that prayer which contemplates "the workings of the Holy Spirit, the events of Pentecost, and the belief that God 'has raised up the Lord Jesus' and 'will raise us, in our turn, and put us by His side' " would be impermissible, as would any prayer that reflects dogma particular to a single faith tradition. Id., at 34 (quoting App. 89a and citing id., at 56a, 123a, 134a).
An insistence on nonsectarian or ecumenical prayer as a single, fixed standard is not consistent with the tradition of legislative prayer outlined in the Court's cases. The Court found the prayers in Marsh consistent with the First Amendment not because they espoused only a generic theism but because our history and tradition have shown that prayer in this limited context could "coexis[t] with the principles of disestablishment and religious freedom." 463 U.S., at 786, 103 S.Ct. 3330. The Congress that drafted the First Amendment would have been accustomed to invocations containing explicitly religious themes of the sort respondents find objectionable. One of the Senate's first chaplains, the Rev. William White, gave prayers in a series that included the Lord's Prayer, the Collect for Ash Wednesday, prayers for peace *579 and grace, a general thanksgiving, St. Chrysostom's Prayer, and a prayer seeking "the grace of our Lord Jesus Christ, &c." Letter from W. White to H. Jones (Dec. 29, 1830), in B. Wilson, Memoir of the Life of the Right Reverend William White, D. D., Bishop of the Protestant Episcopal Church in the State of Pennsylvania 322 (1839); see also New Hampshire Patriot & State Gazette, Dec. 15, 1823, p. 1 (describing a Senate prayer addressing the "Throne of Grace"); Cong. Globe, 37th Cong., 1st Sess., 2 (1861) (reciting the Lord's Prayer). The decidedly Christian nature of these prayers must not be dismissed as the relic of a time when our Nation was less pluralistic than it is today. Congress continues to permit its appointed and visiting chaplains to express themselves in a religious idiom. It acknowledges our growing diversity not by proscribing sectarian content but by welcoming *1821 ministers of many creeds. See, e.g., 160 Cong. Rec. S1329 (Mar. 6, 2014) (Dalai Lama) ("I am a Buddhist monk-a simple Buddhist monk-so we pray to Buddha and all other Gods"); 159 Cong. Rec. H7006 (Nov. 13, 2013) (Rabbi Joshua Gruenberg) ("Our God and God of our ancestors, Everlasting Spirit of the Universe ..."); 159 Cong. Rec. H3024 (June 4, 2013) (Satguru Bodhinatha Veylanswami) ("Hindu scripture declares, without equivocation, that the highest of high ideals is to never knowingly harm anyone"); 158 Cong. Rec. H5633 (Aug. 2, 2012) (Imam Nayyar Imam) ("The final prophet of God, Muhammad, peace be upon him, stated: 'The leaders of a people are a representation of their deeds' ").
The contention that legislative prayer must be generic or nonsectarian derives from dictum in County of Allegheny, 492 U.S. 573, 109 S.Ct. 3086, that was disputed when written and has been repudiated by later cases. There the Court held that a crèche placed on the steps of a county courthouse to celebrate the Christmas season violated the Establishment Clause because it had "the effect of endorsing a patently Christian message." Id., at 601, 109 S.Ct. 3086. Four dissenting Justices disputed that endorsement could be the proper test, as it *580 likely would condemn a host of traditional practices that recognize the role religion plays in our society, among them legislative prayer and the "forthrightly religious" Thanksgiving proclamations issued by nearly every President since Washington. Id., at 670-671, 109 S.Ct. 3086. The Court sought to counter this criticism by recasting Marsh to permit only prayer that contained no overtly Christian references:
"However history may affect the constitutionality of nonsectarian references to religion by the government, history cannot legitimate practices that demonstrate the government's allegiance to a particular sect or creed.... The legislative prayers involved in Marsh did not violate this principle because the particular chaplain had 'removed all references to Christ.' " Id., at 603 [109 S.Ct. 3086] (quoting Marsh, supra, at 793, n. 14 [103 S.Ct. 3330]; footnote omitted).
This proposition is irreconcilable with the facts of Marsh and with its holding and reasoning. Marsh nowhere suggested that the constitutionality of legislative prayer turns on the neutrality of its content. The opinion noted that Nebraska's chaplain, the Rev. Robert E. Palmer, modulated the "explicitly Christian" nature of his prayer and "removed all references to Christ" after a Jewish lawmaker complained. 463 U.S., at 793, n. 14, 103 S.Ct. 3330. With this footnote, the Court did no more than observe the practical demands placed on a minister who holds a permanent, appointed position in a legislature and chooses to write his or her prayers to appeal to more members, or at least to give less offense to those who object. See Mallory, " An Officer of the House Which Chooses Him, and Nothing More": How Should Marsh v. Chambers Apply to Rotating Chaplains?, 73 U. Chi. L.Rev. 1421, 1445 (2006). Marsh did not suggest that Nebraska's prayer practice would have failed had the chaplain not acceded to the legislator's request. Nor did the Court imply the rule that prayer violates the Establishment Clause any time it is given in the name of a figure deified by only one *581 faith or creed. See Van Orden, 545 U.S., at 688, n. 8, 125 S.Ct. 2854 (recognizing that the prayers in Marsh were "often explicitly Christian" and rejecting the view that this gave rise to an establishment violation). To the contrary, the Court instructed that the "content of the prayer is not of concern to judges," provided "there is no indication that the prayer opportunity has been exploited to proselytize or *1822 advance any one, or to disparage any other, faith or belief." 463 U.S., at 794-795, 103 S.Ct. 3330.
To hold that invocations must be nonsectarian would force the legislatures that sponsor prayers and the courts that are asked to decide these cases to act as supervisors and censors of religious speech, a rule that would involve government in religious matters to a far greater degree than is the case under the town's current practice of neither editing or approving prayers in advance nor criticizing their content after the fact. Cf. Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC, 565 U.S. ----, ----, 132 S.Ct. 694, 705-706, 181 L.Ed.2d 650 (2012). Our Government is prohibited from prescribing prayers to be recited in our public institutions in order to promote a preferred system of belief or code of moral behavior. Engel v. Vitale, 370 U.S. 421, 430, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). It would be but a few steps removed from that prohibition for legislatures to require chaplains to redact the religious content from their message in order to make it acceptable for the public sphere. Government may not mandate a civic religion that stifles any but the most generic reference to the sacred any more than it may prescribe a religious orthodoxy. See Lee v. Weisman, 505 U.S. 577, 590, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) ("The suggestion that government may establish an official or civic religion as a means of avoiding the establishment of a religion with more specific creeds strikes us as a contradiction that cannot be accepted"); Schempp, 374 U.S., at 306, 83 S.Ct. 1560 (Goldberg, J., concurring) (arguing that "untutored devotion to the concept of neutrality" must not lead to "a brooding and pervasive devotion to the secular").
*582 Respondents argue, in effect, that legislative prayer may be addressed only to a generic God. The law and the Court could not draw this line for each specific prayer or seek to require ministers to set aside their nuanced and deeply personal beliefs for vague and artificial ones. There is doubt, in any event, that consensus might be reached as to what qualifies as generic or nonsectarian. Honorifics like "Lord of Lords" or "King of Kings" might strike a Christian audience as ecumenical, yet these titles may have no place in the vocabulary of other faith traditions. The difficulty, indeed the futility, of sifting sectarian from nonsectarian speech is illustrated by a letter that a lawyer for the respondents sent the town in the early stages of this litigation. The letter opined that references to "Father, God, Lord God, and the Almighty" would be acceptable in public prayer, but that references to "Jesus Christ, the Holy Spirit, and the Holy Trinity" would not. App. 21a. Perhaps the writer believed the former grouping would be acceptable to monotheists. Yet even seemingly general references to God or the Father might alienate nonbelievers or polytheists. McCreary County v. American Civil Liberties Union of Ky., 545 U.S. 844, 893, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) (SCALIA, J., dissenting). Because it is unlikely that prayer will be inclusive beyond dispute, it would be unwise to adopt what respondents think is the next-best option: permitting those religious words, and only those words, that are acceptable to the majority, even if they will exclude some. Torcaso v. Watkins, 367 U.S. 488, 495, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961). The First Amendment is not a majority rule, and government may not seek to define permissible categories of religious speech. Once it invites prayer into the public sphere, government must permit a prayer giver to address his or her own God or gods as conscience dictates, *1823 unfettered by what an administrator or judge considers to be nonsectarian.
In rejecting the suggestion that legislative prayer must be nonsectarian, the Court does not imply that no constraints remain on its content. The relevant constraint derives from *583 its place at the opening of legislative sessions, where it is meant to lend gravity to the occasion and reflect values long part of the Nation's heritage. Prayer that is solemn and respectful in tone, that invites lawmakers to reflect upon shared ideals and common ends before they embark on the fractious business of governing, serves that legitimate function. If the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion, many present may consider the prayer to fall short of the desire to elevate the purpose of the occasion and to unite lawmakers in their common effort. That circumstance would present a different case than the one presently before the Court.
The tradition reflected in Marsh permits chaplains to ask their own God for blessings of peace, justice, and freedom that find appreciation among people of all faiths. That a prayer is given in the name of Jesus, Allah, or Jehovah, or that it makes passing reference to religious doctrines, does not remove it from that tradition. These religious themes provide particular means to universal ends. Prayer that reflects beliefs specific to only some creeds can still serve to solemnize the occasion, so long as the practice over time is not "exploited to proselytize or advance any one, or to disparage any other, faith or belief." Marsh, 463 U.S., at 794-795, 103 S.Ct. 3330.
It is thus possible to discern in the prayers offered to Congress a commonality of theme and tone. While these prayers vary in their degree of religiosity, they often seek peace for the Nation, wisdom for its lawmakers, and justice for its people, values that count as universal and that are embodied not only in religious traditions, but in our founding documents and laws. The first prayer delivered to the Continental Congress by the Rev. Jacob Duché on Sept. 7, 1774, provides an example:
"Be Thou present O God of Wisdom and direct the counsel of this Honorable Assembly; enable them to settle all things on the best and surest foundations; that *584 the scene of blood may be speedily closed; that Order, Harmony, and Peace be effectually restored, and the Truth and Justice, Religion and Piety, prevail and flourish among the people.
"Preserve the health of their bodies, and the vigor of their minds, shower down on them, and the millions they here represent, such temporal Blessings as Thou seest expedient for them in this world, and crown them with everlasting Glory in the world to come. All this we ask in the name and through the merits of Jesus Christ, Thy Son and our Saviour, Amen." W. Federer, America's God and Country 137 (2000).
From the earliest days of the Nation, these invocations have been addressed to assemblies comprising many different creeds. These ceremonial prayers strive for the idea that people of many faiths may be united in a community of tolerance and devotion. Even those who disagree as to religious doctrine may find common ground in the desire to show respect for the divine in all aspects of their lives and being. Our tradition assumes that adult citizens, firm in their own beliefs, can tolerate and perhaps appreciate a ceremonial prayer delivered by a person of a different faith. See Letter from John Adams to Abigail Adams (Sept. 16, 1774), in C.
*1824 Adams, Familiar Letters of John Adams and His Wife Abigail Adams, During the Revolution 37-38 (1876).
The prayers delivered in the town of Greece do not fall outside the tradition this Court has recognized. A number of the prayers did invoke the name of Jesus, the Heavenly Father, or the Holy Spirit, but they also invoked universal themes, as by celebrating the changing of the seasons or calling for a "spirit of cooperation" among town leaders. App. 31a, 38a. Among numerous examples of such prayer in the record is the invocation given by the Rev. Richard Barbour at the September 2006 board meeting:
"Gracious God, you have richly blessed our nation and this community. Help us to remember your generosity *585 and give thanks for your goodness. Bless the elected leaders of the Greece Town Board as they conduct the business of our town this evening. Give them wisdom, courage, discernment and a single-minded desire to serve the common good. We ask your blessing on all public servants, and especially on our police force, firefighters, and emergency medical personnel.... Respectful of every religious tradition, I offer this prayer in the name of God's only son Jesus Christ, the Lord, Amen." Id., at 98a-99a.
Respondents point to other invocations that disparaged those who did not accept the town's prayer practice. One guest minister characterized objectors as a "minority" who are "ignorant of the history of our country," id., at 108a, while another lamented that other towns did not have "God-fearing" leaders, id., at 79a. Although these two remarks strayed from the rationale set out in Marsh, they do not despoil a practice that on the whole reflects and embraces our tradition. Absent a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose, a challenge based solely on the content of a prayer will not likely establish a constitutional violation. Marsh, indeed, requires an inquiry into the prayer opportunity as a whole, rather than into the contents of a single prayer. 463 U.S., at 794-795, 103 S.Ct. 3330.
Finally, the Court disagrees with the view taken by the Court of Appeals that the town of Greece contravened the Establishment Clause by inviting a predominantly Christian set of ministers to lead the prayer. The town made reasonable efforts to identify all of the congregations located within its borders and represented that it would welcome a prayer by any minister or layman who wished to give one. That nearly all of the congregations in town turned out to be Christian does not reflect an aversion or bias on the part of town leaders against minority faiths. So long as the town maintains a policy of nondiscrimination, the Constitution *586 does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing. The quest to promote "a 'diversity' of religious views" would require the town "to make wholly inappropriate judgments about the number of religions [it] should sponsor and the relative frequency with which it should sponsor each," Lee, 505 U.S., at 617, 112 S.Ct. 2649 (Souter, J., concurring), a form of government entanglement with religion that is far more troublesome than the current approach.
B
Respondents further seek to distinguish the town's prayer practice from the tradition upheld in Marsh on the ground that it coerces participation by nonadherents. They and some amici contend that prayer conducted in the intimate setting of a town board meeting differs in *1825 fundamental ways from the invocations delivered in Congress and state legislatures, where the public remains segregated from legislative activity and may not address the body except by occasional invitation. Citizens attend town meetings, on the other hand, to accept awards; speak on matters of local importance; and petition the board for action that may affect their economic interests, such as the granting of permits, business licenses, and zoning variances. Respondents argue that the public may feel subtle pressure to participate in prayers that violate their beliefs in order to please the board members from whom they are about to seek a favorable ruling. In their view the fact that board members in small towns know many of their constituents by name only increases the pressure to conform.
It is an elemental First Amendment principle that government may not coerce its citizens "to support or participate in any religion or its exercise." County of Allegheny, 492 U.S., at 659, 109 S.Ct. 3086 (KENNEDY, J., concurring in judgment in part and dissenting in part); see also Van Orden, 545 U.S., at 683, 125 S.Ct. 2854 (plurality opinion) (recognizing that our "institutions must *587 not press religious observances upon their citizens"). On the record in this case the Court is not persuaded that the town of Greece, through the act of offering a brief, solemn, and respectful prayer to open its monthly meetings, compelled its citizens to engage in a religious observance. The inquiry remains a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed.
The prayer opportunity in this case must be evaluated against the backdrop of historical practice. As a practice that has long endured, legislative prayer has become part of our heritage and tradition, part of our expressive idiom, similar to the Pledge of Allegiance, inaugural prayer, or the recitation of "God save the United States and this honorable Court" at the opening of this Court's sessions. See Lynch, 465 U.S., at 693, 104 S.Ct. 1355 (O'Connor, J., concurring). It is presumed that the reasonable observer is acquainted with this tradition and understands that its purposes are to lend gravity to public proceedings and to acknowledge the place religion holds in the lives of many private citizens, not to afford government an opportunity to proselytize or force truant constituents into the pews. See Salazar v. Buono, 559 U.S. 700, 720-721, 130 S.Ct. 1803, 176 L.Ed.2d 634 (2010) (plurality opinion); Santa Fe Independent School Dist. v. Doe, 530 U.S. 290, 308, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000). That many appreciate these acknowledgments of the divine in our public institutions does not suggest that those who disagree are compelled to join the expression or approve its content. West Virginia State Bd. of Ed. v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).
The principal audience for these invocations is not, indeed, the public but lawmakers themselves, who may find that a moment of prayer or quiet reflection sets the mind to a higher purpose and thereby eases the task of governing. The District Court in Marsh described the prayer exercise as "an internal act" directed at the Nebraska Legislature's "own members,"
*588 Chambers v. Marsh, 504 F.Supp. 585, 588 (D.Neb.1980), rather than an effort to promote religious observance among the public. See also Lee, 505 U.S., at 630, n. 8, 112 S.Ct. 2649 (Souter, J., concurring) (describing Marsh as a case "in which government officials invoke[d] spiritual inspiration entirely for their own benefit"); Atheists of Fla., Inc. v. Lakeland, 713 F.3d 577, 583 (C.A.11 2013) (quoting a city resolution providing for prayer "for the benefit and blessing of" elected leaders); Madison's *1826 Detached Memoranda 558 (characterizing prayer in Congress as "religious worship for national representatives"); Brief for U.S. Senator Marco Rubio et al. as Amici Curiae 30-33; Brief for 12 Members of Congress as Amici Curiae 6. To be sure, many members of the public find these prayers meaningful and wish to join them. But their purpose is largely to accommodate the spiritual needs of lawmakers and connect them to a tradition dating to the time of the Framers. For members of town boards and commissions, who often serve part-time and as volunteers, ceremonial prayer may also reflect the values they hold as private citizens. The prayer is an opportunity for them to show who and what they are without denying the right to dissent by those who disagree.
The analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity. No such thing occurred in the town of Greece. Although board members themselves stood, bowed their heads, or made the sign of the cross during the prayer, they at no point solicited similar gestures by the public. Respondents point to several occasions where audience members were asked to rise for the prayer. These requests, however, came not from town leaders but from the guest ministers, who presumably are accustomed to directing their congregations in this way and might have done so thinking the action was inclusive, not coercive. See App. 69a ("Would you bow your heads with me as we invite the Lord's presence *589 here tonight?"); id., at 93a ("Let us join our hearts and minds together in prayer"); id., at 102a ("Would you join me in a moment of prayer?"); id., at 110a ("Those who are willing may join me now in prayer"). Respondents suggest that constituents might feel pressure to join the prayers to avoid irritating the officials who would be ruling on their petitions, but this argument has no evidentiary support. Nothing in the record indicates that town leaders allocated benefits and burdens based on participation in the prayer, or that citizens were received differently depending on whether they joined the invocation or quietly declined. In no instance did town leaders signal disfavor toward nonparticipants or suggest that their stature in the community was in any way diminished. A practice that classified citizens based on their religious views would violate the Constitution, but that is not the case before this Court.
In their declarations in the trial court, respondents stated that the prayers gave them offense and made them feel excluded and disrespected. Offense, however, does not equate to coercion. Adults often encounter speech they find disagreeable; and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views in a legislative forum, especially where, as here, any member of the public is welcome in turn to offer an invocation reflecting his or her own convictions. See Elk Grove Unified School Dist. v. Newdow, 542 U.S. 1, 44, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (O'Connor, J., concurring) ("The compulsion of which Justice Jackson was concerned ... was of the direct sort-the Constitution does not guarantee citizens a right entirely to avoid ideas with which they disagree"). If circumstances arise in which the pattern and practice of ceremonial, legislative prayer is alleged to be a means to coerce or intimidate others, the objection can be addressed in the regular course. But the showing has not been made here, where the prayers neither chastised dissenters nor attempted lengthy disquisition on *590 religious dogma. Courts remain free to review *1827 the pattern of prayers over time to determine whether they comport with the tradition of solemn, respectful prayer approved in Marsh, or whether coercion is a real and substantial likelihood. But in the general course legislative bodies do not engage in impermissible coercion merely by exposing constituents to prayer they would rather not hear and in which they need not participate. See County of Allegheny, 492 U.S., at 670, 109 S.Ct. 3086 (KENNEDY, J., concurring in judgment in part and dissenting in part).
This case can be distinguished from the conclusions and holding of Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467. There the Court found that, in the context of a graduation where school authorities maintained close supervision over the conduct of the students and the substance of the ceremony, a religious invocation was coercive as to an objecting student. Id., at 592-594, 112 S.Ct. 2649; see also Santa Fe Independent School Dist., 530 U.S., at 312, 120 S.Ct. 2266. Four Justices dissented in Lee, but the circumstances the Court confronted there are not present in this case and do not control its outcome. Nothing in the record suggests that members of the public are dissuaded from leaving the meeting room during the prayer, arriving late, or even, as happened here, making a later protest. In this case, as in Marsh, board members and constituents are "free to enter and leave with little comment and for any number of reasons." Lee, supra, at 597, 112 S.Ct. 2649. Should nonbelievers choose to exit the room during a prayer they find distasteful, their absence will not stand out as disrespectful or even noteworthy. And should they remain, their quiet acquiescence will not, in light of our traditions, be interpreted as an agreement with the words or ideas expressed. Neither choice represents an unconstitutional imposition as to mature adults, who "presumably" are "not readily susceptible to religious indoctrination or peer pressure." Marsh, 463 U.S., at 792, 103 S.Ct. 3330 (internal quotation marks and citations omitted).
*591 In the town of Greece, the prayer is delivered during the ceremonial portion of the town's meeting. Board members are not engaged in policymaking at this time, but in more general functions, such as swearing in new police officers, inducting high school athletes into the town hall of fame, and presenting proclamations to volunteers, civic groups, and senior citizens. It is a moment for town leaders to recognize the achievements of their constituents and the aspects of community life that are worth celebrating. By inviting ministers to serve as chaplain for the month, and welcoming them to the front of the room alongside civic leaders, the town is acknowledging the central place that religion, and religious institutions, hold in the lives of those present. Indeed, some congregations are not simply spiritual homes for town residents but also the provider of social services for citizens regardless of their beliefs. See App. 31a (thanking a pastor for his "community involvement"); id., at 44a (thanking a deacon "for the job that you have done on behalf of our community"). The inclusion of a brief, ceremonial prayer as part of a larger exercise in civic recognition suggests that its purpose and effect are to acknowledge religious leaders and the institutions they represent rather than to exclude or coerce nonbelievers.
Ceremonial prayer is but a recognition that, since this Nation was founded and until the present day, many Americans deem that their own existence must be understood by precepts far beyond the authority of government to alter or define and that willing participation in civic affairs can be consistent with a brief acknowledgment of their belief in a higher *1828 power, always with due respect for those who adhere to other beliefs. The prayer in this case has a permissible ceremonial purpose. It is not an unconstitutional establishment of religion.
* * *
The town of Greece does not violate the First Amendment by opening its meetings with prayer that comports with our *592 tradition and does not coerce participation by nonadherents. The judgment of the U.S. Court of Appeals for the Second Circuit is reversed.
It is so ordered.
Justice ALITO, with whom Justice SCALIA joins, concurring.
I write separately to respond to the principal dissent, which really consists of two very different but intertwined opinions. One is quite narrow; the other is sweeping. I will address both.
I
First, however, since the principal dissent accuses the Court of being blind to the facts of this case, post, at 1851 - 1852 (opinion of KAGAN, J.), I recount facts that I find particularly salient.
The town of Greece is a municipality in upstate New York that borders the city of Rochester. The town decided to emulate a practice long established in Congress and state legislatures by having a brief prayer before sessions of the town board. The task of lining up clergy members willing to provide such a prayer was given to the town's office of constituent services. 732 F.Supp.2d 195, 197-198 (W.D.N.Y.2010). For the first four years of the practice, a clerical employee in the office would randomly call religious organizations listed in the Greece "Community Guide," a local directory published by the Greece Chamber of Commerce, until she was able to find somebody willing to give the invocation. Id., at 198. This employee eventually began keeping a list of individuals who had agreed to give the invocation, and when a second clerical employee took over the task of finding prayer-givers, the first employee gave that list to the second. Id., at 198, 199. The second employee then randomly called organizations on that list-and possibly others in the Community Guide-until she found someone who agreed to provide the prayer. Id., at 199.
*593 Apparently, all the houses of worship listed in the local Community Guide were Christian churches. Id., at 198-200, 203. That is unsurprising given the small number of non-Christians in the area. Although statistics for the town of Greece alone do not seem to be available, statistics have been compiled for Monroe County, which includes both the town of Greece and the city of Rochester. According to these statistics, of the county residents who have a religious affiliation, about 3% are Jewish, and for other non-Christian faiths, the percentages are smaller.[1] There are no synagogues within the borders of the town of Greece, id., at 203, but there are several not far away across the Rochester border. Presumably, Jewish residents of the town worship at one or more of those synagogues, but because these synagogues fall outside the town's borders, they were not listed in the town's local directory, and the responsible town employee did not include them on her list. Ibid . Nor did she include any other non-Christian house of worship. Id., at 198-200.[2]
*1829 As a result of this procedure, for some time all the prayers at the beginning of town board meetings were offered by Christian clergy, and many of these prayers were distinctively Christian. But respondents do not claim that the list was attributable to religious bias or favoritism, and the Court of Appeals acknowledged that the town had "no religious animus." 681 F.3d 20, 32 (C.A.2 2012).
For some time, the town's practice does not appear to have elicited any criticism, but when complaints were received, *594 the town made it clear that it would permit any interested residents, including nonbelievers, to provide an invocation, and the town has never refused a request to offer an invocation. Id., at 23, 25; 732 F.Supp.2d, at 197. The most recent list in the record of persons available to provide an invocation includes representatives of many non-Christian faiths. App. in No. 10-3635 (CA2), pp. A1053-A1055 (hereinafter CA2 App.).
Meetings of the Greece Town Board appear to have been similar to most other town council meetings across the country. The prayer took place at the beginning of the meetings. The board then conducted what might be termed the "legislative" portion of its agenda, during which residents were permitted to address the board. After this portion of the meeting, a separate stage of the meetings was devoted to such matters as formal requests for variances. See Brief for Respondents 5-6; CA2 App. A929-A930; e.g., CA2 App. A1058, A1060.
No prayer occurred before this second part of the proceedings, and therefore I do not understand this case to involve the constitutionality of a prayer prior to what may be characterized as an adjudicatory proceeding. The prayer preceded only the portion of the town board meeting that I view as essentially legislative. While it is true that the matters considered by the board during this initial part of the meeting might involve very specific questions, such as the installation of a traffic light or stop sign at a particular intersection, that does not transform the nature of this part of the meeting.
II
I turn now to the narrow aspect of the principal dissent, and what we find here is that the principal dissent's objection, in the end, is really quite niggling. According to the principal dissent, the town could have avoided any constitutional problem in either of two ways.
*595 A
First, the principal dissent writes, "[i]f the Town Board had let its chaplains know that they should speak in nonsectarian terms, common to diverse religious groups, then no one would have valid grounds for complaint." Post, at 1851. "Priests and ministers, rabbis and imams," the principal dissent continues, "give such invocations all the time" without any great difficulty. Post, at 1851.
Both Houses of Congress now advise guest chaplains that they should keep in mind that they are addressing members from a variety of faith traditions, and as a matter of policy, this advice has much to recommend it. But any argument that *1830 nonsectarian prayer is constitutionally required runs headlong into a long history of contrary congressional practice. From the beginning, as the Court notes, many Christian prayers were offered in the House and Senate, see ante, at 1818, and when rabbis and other non-Christian clergy have served as guest chaplains, their prayers have often been couched in terms particular to their faith traditions.[3]
Not only is there no historical support for the proposition that only generic prayer is allowed, but as our country has become more diverse, composing a prayer that is acceptable to all members of the community who hold religious beliefs has become harder and harder. It was one thing to compose a prayer that is acceptable to both Christians and Jews; it is much harder to compose a prayer that is also acceptable to followers of Eastern religions that are now well represented *596 in this country. Many local clergy may find the project daunting, if not impossible, and some may feel that they cannot in good faith deliver such a vague prayer.
In addition, if a town attempts to go beyond simply recommending that a guest chaplain deliver a prayer that is broadly acceptable to all members of a particular community (and the groups represented in different communities will vary), the town will inevitably encounter sensitive problems. Must a town screen and, if necessary, edit prayers before they are given? If prescreening is not required, must the town review prayers after they are delivered in order to determine if they were sufficiently generic? And if a guest chaplain crosses the line, what must the town do? Must the chaplain be corrected on the spot? Must the town strike this chaplain (and perhaps his or her house of worship) from the approved list?
B
If a town wants to avoid the problems associated with this first option, the principal dissent argues, it has another choice: It may "invit[e] clergy of many faiths." Post, at 1851. "When one month a clergy member refers to Jesus, and the next to Allah or Jehovah," the principal dissent explains, "the government does not identify itself with one religion or align itself with that faith's citizens, and the effect of even sectarian prayer is transformed." Ibid.
If, as the principal dissent appears to concede, such a rotating system would obviate any constitutional problems, then despite all its high rhetoric, the principal dissent's quarrel with the town of Greece really boils down to this: The town's clerical employees did a bad job in compiling the list of potential guest chaplains. For that is really the only difference between what the town did and what the principal dissent is willing to accept. The Greece clerical employee drew up her list using the town directory instead of a directory covering the entire greater Rochester area. If the task of putting together the list had been handled in a more sophisticated *597 way, the employee in charge would have realized that the town's Jewish residents attended synagogues on the Rochester side of the border and would have added one or more synagogues to the list. *1831 But the mistake was at worst careless, and it was not done with a discriminatory intent. (I would view this case very differently if the omission of these synagogues were intentional.)
The informal, imprecise way in which the town lined up guest chaplains is typical of the way in which many things are done in small and medium-sized units of local government. In such places, the members of the governing body almost always have day jobs that occupy much of their time. The town almost never has a legal office and instead relies for legal advice on a local attorney whose practice is likely to center on such things as land-use regulation, contracts, and torts. When a municipality like the town of Greece seeks in good faith to emulate the congressional practice on which our holding in Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), was largely based, that municipality should not be held to have violated the Constitution simply because its method of recruiting guest chaplains lacks the demographic exactitude that might be regarded as optimal.
The effect of requiring such exactitude would be to pressure towns to forswear altogether the practice of having a prayer before meetings of the town council. Many local officials, puzzled by our often puzzling Establishment Clause jurisprudence and terrified of the legal fees that may result from a lawsuit claiming a constitutional violation, already think that the safest course is to ensure that local government is a religion-free zone. Indeed, the Court of Appeals' opinion in this case advised towns that constitutional difficulties "may well prompt municipalities to pause and think carefully before adopting legislative prayer." 681 F.3d, at 34. But if, as precedent and historic practice make clear (and the principal dissent concedes), prayer before a legislative session is not inherently inconsistent with the First Amendment, *598 then a unit of local government should not be held to have violated the First Amendment simply because its procedure for lining up guest chaplains does not comply in all respects with what might be termed a "best practices" standard.
III
While the principal dissent, in the end, would demand no more than a small modification in the procedure that the town of Greece initially followed, much of the rhetoric in that opinion sweeps more broadly. Indeed, the logical thrust of many of its arguments is that prayer is never permissible prior to meetings of local government legislative bodies. At Greece Town Board meetings, the principal dissent pointedly notes, ordinary citizens (and even children!) are often present. Post, at 1846 - 1847. The guest chaplains stand in front of the room facing the public. "[T]he setting is intimate," and ordinary citizens are permitted to speak and to ask the board to address problems that have a direct effect on their lives. Post, at 1846 - 1847. The meetings are "occasions for ordinary citizens to engage with and petition their government, often on highly individualized matters." Post, at 1845. Before a session of this sort, the principal dissent argues, any prayer that is not acceptable to all in attendance is out of bounds.
The features of Greece meetings that the principal dissent highlights are by no means unusual.[4] It is common for residents *1832 to attend such meetings, either to speak on matters on the agenda or to request that the town address other issues *599 that are important to them. Nor is there anything unusual about the occasional attendance of students, and when a prayer is given at the beginning of such a meeting, I expect that the chaplain generally stands at the front of the room and faces the public. To do otherwise would probably be seen by many as rude. Finally, although the principal dissent, post, at 1847 - 1848, attaches importance to the fact that guest chaplains in the town of Greece often began with the words "Let us pray," that is also commonplace and for many clergy, I suspect, almost reflexive.[5] In short, I see nothing out of the ordinary about any of the features that the principal dissent notes. Therefore, if prayer is not allowed at meetings with those characteristics, local government legislative bodies, unlike their national and state counterparts, cannot begin their meetings with a prayer. I see no sound basis for drawing such a distinction.
IV
The principal dissent claims to accept the Court's decision in Marsh v. Chambers, which upheld the constitutionality of the Nebraska Legislature's practice of prayer at the beginning of legislative sessions, but the principal dissent's acceptance of Marsh appears to be predicated on the view that the prayer at issue in that case was little more than a formality to which the legislators paid scant attention. The principal dissent describes this scene: A session of the state legislature begins with or without most members present; a strictly nonsectarian prayer is recited while some legislators remain seated; and few members of the public are exposed to the experience. Post, at 1845 - 1846. This sort of perfunctory and hidden-away prayer, the principal dissent implies, is all that Marsh and the First Amendment can tolerate.
*600 It is questionable whether the principal dissent accurately describes the Nebraska practice at issue in Marsh,[6] but what is important is not so much what happened in Nebraska in the years prior to Marsh, but what happened before congressional sessions during the period leading up to the adoption of the First Amendment. By that time, prayer before legislative sessions already had an impressive pedigree, and it is important to recall that history and the events that led to the adoption of the practice.
The principal dissent paints a picture of "morning in Nebraska" circa 1983, see post, at 1846, but it is more instructive to consider "morning in Philadelphia," September 1774. The First Continental Congress convened in Philadelphia, and the need for the 13 colonies to unite was imperative.
*1833 But "[m]any things set colony apart from colony," and prominent among these sources of division was religion.[7] "Purely as a practical matter," however, the project of bringing the colonies together required that these divisions be overcome.[8]
Samuel Adams sought to bridge these differences by prodding a fellow Massachusetts delegate to move to open the session with a prayer.[9] As John Adams later recounted, this motion was opposed on the ground that the delegates were "so divided in religious sentiments, some Episcopalians, *601 some Quakers, some Anabaptists, some Presbyterians, and some Congregationalists, that [they] could not join in the same act of worship."[10] In response, Samuel Adams proclaimed that "he was no bigot, and could hear a prayer from a gentleman of piety and virtue, who was at the same time a friend to his country."[11] Putting aside his personal prejudices,[12] he moved to invite a local Anglican minister, Jacob Duché, to lead the first prayer.[13]
The following morning, Duché appeared in full "pontificals" and delivered both the Anglican prayers for the day and an extemporaneous prayer.[14] For many of the delegates-members of religious groups that had come to America to escape persecution in Britain-listening to a distinctively Anglican prayer by a minister of the Church of England represented an act of notable ecumenism. But Duché's prayer met with wide approval-John Adams wrote that it "filled the bosom of every man" in attendance[15] -and the practice was continued. This first congressional prayer was emphatically Christian, and it was neither an empty formality nor strictly nondenominational.[16] But one of its purposes, and presumably one of its effects, was not to divide, but to unite.
It is no wonder, then, that the practice of beginning congressional sessions with a prayer was continued after the *602 Revolution ended and the new Constitution was adopted. One of the first actions taken by the new Congress when it convened in 1789 was to appoint chaplains for both Houses. The first Senate chaplain, an Episcopalian, was appointed on April 25, 1789, and the first House chaplain, a Presbyterian, was appointed on May 1.[17] Three days later, Madison announced that he planned to introduce proposed constitutional amendments to protect individual rights; *1834 on June 8, 1789, those amendments were introduced; and on September 26, 1789, the amendments were approved to be sent to the States for ratification.[18] In the years since the adoption of the First Amendment, the practice of prayer before sessions of the House and Senate has continued, and opening prayers from a great variety of faith traditions have been offered.
This Court has often noted that actions taken by the First Congress are presumptively consistent with the Bill of Rights, see, e.g., Harmelin v. Michigan, 501 U.S. 957, 980, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), Carroll v. United States, 267 U.S. 132, 150-152, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and this principle has special force when it comes to the interpretation of the Establishment Clause. This Court has always purported to base its Establishment Clause decisions on the original meaning of that provision. Thus, in Marsh, when the Court was called upon to decide whether prayer prior to sessions of a state legislature was consistent with the Establishment Clause, we relied heavily on the history of prayer before sessions of Congress and held that a state legislature may follow a similar practice. See 463 U.S., at 786-792, 103 S.Ct. 3330.
There can be little doubt that the decision in Marsh reflected the original understanding of the First Amendment. It is virtually inconceivable that the First Congress, having appointed *603 chaplains whose responsibilities prominently included the delivery of prayers at the beginning of each daily session, thought that this practice was inconsistent with the Establishment Clause. And since this practice was well established and undoubtedly well known, it seems equally clear that the state legislatures that ratified the First Amendment had the same understanding. In the case before us, the Court of Appeals appeared to base its decision on one of the Establishment Clause " tests" set out in the opinions of this Court, see 681 F.3d, at 26, 30, but if there is any inconsistency between any of those tests and the historic practice of legislative prayer, the inconsistency calls into question the validity of the test, not the historic practice.
V
This brings me to my final point. I am troubled by the message that some readers may take from the principal dissent's rhetoric and its highly imaginative hypotheticals. For example, the principal dissent conjures up the image of a litigant awaiting trial who is asked by the presiding judge to rise for a Christian prayer, of an official at a polling place who conveys the expectation that citizens wishing to vote make the sign of the cross before casting their ballots, and of an immigrant seeking naturalization who is asked to bow her head and recite a Christian prayer. Although I do not suggest that the implication is intentional, I am concerned that at least some readers will take these hypotheticals as a warning that this is where today's decision leads-to a country in which religious minorities are denied the equal benefits of citizenship.
Nothing could be further from the truth. All that the Court does today is to allow a town to follow a practice that we have previously held is permissible for Congress and state legislatures. In seeming to suggest otherwise, the principal dissent goes far astray.
*1835 Justice THOMAS, with whom Justice SCALIA joins as to Part II, concurring in part and concurring in the judgment.
*604 Except for Part II-B, I join the opinion of the Court, which faithfully applies Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). I write separately to reiterate my view that the Establishment Clause is "best understood as a federalism provision," Elk Grove Unified School Dist. v. Newdow, 542 U.S. 1, 50, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (THOMAS, J., concurring in judgment), and to state my understanding of the proper "coercion" analysis.
I
The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const., Amdt. 1. As I have explained before, the text and history of the Clause "resis[t] incorporation" against the States. Newdow, supra, at 45-46, 124 S.Ct. 2301; see also Van Orden v. Perry, 545 U.S. 677, 692-693, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005) (THOMAS, J., concurring); Zelman v. Simmons-Harris, 536 U.S. 639, 677-680, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002) (same). If the Establishment Clause is not incorporated, then it has no application here, where only municipal action is at issue.
As an initial matter, the Clause probably prohibits Congress from establishing a national religion. Cf. D. Drakeman, Church, State, and Original Intent 260-262 (2010). The text of the Clause also suggests that Congress "could not interfere with state establishments, notwithstanding any argument that could be made based on Congress' power under the Necessary and Proper Clause." Newdow, supra, at 50, 124 S.Ct. 2301 (opinion of THOMAS, J.). The language of the First Amendment ("Congress shall make no law") "precisely tracked and inverted the exact wording" of the Necessary and Proper Clause ("Congress shall have power ... to make all laws which shall be necessary and proper ..."), which was the subject of fierce criticism by Anti-Federalists at the time of ratification. A. Amar, The Bill of Rights 39 (1998) (hereinafter Amar); see also Natelson, The Framing and Adoption of the Necessary *605 and Proper Clause, in The Origins of the Necessary and Proper Clause 84, 94-96 (G. Lawson, G. Miller, R. Natelson, & G. Seidman eds. 2010) (summarizing Anti-Federalist claims that the Necessary and Proper Clause would aggrandize the powers of the Federal Government). That choice of language-"Congress shall make no law"-effectively denied Congress any power to regulate state establishments.
Construing the Establishment Clause as a federalism provision accords with the variety of church-state arrangements that existed at the Founding. At least six States had established churches in 1789. Amar 32-33. New England States like Massachusetts, Connecticut, and New Hampshire maintained local-rule establishments whereby the majority in each town could select the minister and religious denomination (usually Congregationalism, or "Puritanism"). McConnell, Establishment and Disestablishment at the Founding, Part I: Establishment of Religion, 44 Wm. & Mary L.Rev. 2105, 2110 (2003) ; see also L. Levy, The Establishment Clause: Religion and the First Amendment 29-51 (1994) (hereinafter Levy). In the South, Maryland, South Carolina, and Georgia eliminated their exclusive Anglican establishments following the American Revolution and adopted general establishments, which permitted taxation in support of all Christian churches (or, as in South Carolina, all Protestant churches). See Levy 52-58; Amar 32-33. Virginia, by contrast, *1836 had recently abolished its official state establishment and ended direct government funding of clergy after a legislative battle led by James Madison. See T. Buckley, Church and State in Revolutionary Virginia, 1776-1787, pp. 155-164 (1977). Other States-principally Rhode Island, Pennsylvania, and Delaware, which were founded by religious dissenters-had no history of formal establishments at all, although they still maintained religious tests for office. See McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L.Rev. 1409, 1425-1426, 1430 (1990). *606 The import of this history is that the relationship between church and state in the fledgling Republic was far from settled at the time of ratification. See Muõz, The Original Meaning of the Establishment Clause and the Impossibility of Its Incorporation, 8 U. Pa. J. Constitutional L. 585, 605 (2006). Although the remaining state establishments were ultimately dismantled-Massachusetts, the last State to disestablish, would do so in 1833, see Levy 42-that outcome was far from assured when the Bill of Rights was ratified in 1791. That lack of consensus suggests that the First Amendment was simply agnostic on the subject of state establishments; the decision to establish or disestablish religion was reserved to the States. Amar 41.
The Federalist logic of the original Establishment Clause poses a special barrier to its mechanical incorporation against the States through the Fourteenth Amendment. See id., at 33. Unlike the Free Exercise Clause, which "plainly protects individuals against congressional interference with the right to exercise their religion," the Establishment Clause "does not purport to protect individual rights." Newdow, 542 U.S., at 50, 124 S.Ct. 2301 (opinion of THOMAS, J.). Instead, the States are the particular beneficiaries of the Clause. Incorporation therefore gives rise to a paradoxical result: Applying the Clause against the States eliminates their right to establish a religion free from federal interference, thereby "prohibit[ing] exactly what the Establishment Clause protected." Id., at 51, 124 S.Ct. 2301; see Amar 33-34.
Put differently, the structural reasons that counsel against incorporating the Tenth Amendment also apply to the Establishment Clause. Id., at 34. To my knowledge, no court has ever suggested that the Tenth Amendment, which "reserve[s] to the States" powers not delegated to the Federal Government, could or should be applied against the States. To incorporate that limitation would be to divest the States of all powers not specifically delegated to them, thereby inverting the original import of the Amendment. Incorporating *607 the Establishment Clause has precisely the same effect.
The most cogent argument in favor of incorporation may be that, by the time of Reconstruction, the framers of the Fourteenth Amendment had come to reinterpret the Establishment Clause (notwithstanding its Federalist origins) as expressing an individual right. On this question, historical evidence from the 1860's is mixed. Congressmen who catalogued the personal rights protected by the First Amendment commonly referred to speech, press, petition, and assembly, but not to a personal right of nonestablishment; instead, they spoke only of " 'free exercise' " or " 'freedom of conscience.' " Amar 253, and 385, n. 91 (collecting sources). There may be reason to think these lists were abbreviated, and silence on the issue is not dispositive. See Lash, *1837 The Second Adoption of the Establishment Clause: The Rise of the Nonestablishment Principle, 27 Ariz. St. L.J. 1085, 1141-1145 (1995) ; but cf. S. Smith, Foreordained Failure: The Quest for a Constitutional Principle of Religious Freedom 50-52 (1995). Given the textual and logical difficulties posed by incorporation, however, there is no warrant for transforming the meaning of the Establishment Clause without a firm historical foundation. See Newdow, supra, at 51, 124 S.Ct. 2301 (opinion of THOMAS, J.). The burden of persuasion therefore rests with those who claim that the Clause assumed a different meaning upon adoption of the Fourteenth Amendment.[1] *608 II
Even if the Establishment Clause were properly incorporated against the States, the municipal prayers at issue in this case bear no resemblance to the coercive state establishments that existed at the founding. "The coercion that was a hallmark of historical establishments of religion was coercion of religious orthodoxy and of financial support by force of law and threat of penalty ." Lee v. Weisman, 505 U.S. 577, 640, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (SCALIA, J., dissenting); see also Perry, 545 U.S., at 693-694, 125 S.Ct. 2854 (THOMAS, J., concurring); Cutter v. Wilkinson, 544 U.S. 709, 729, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) (THOMAS, J., concurring); Newdow, supra, at 52, 124 S.Ct. 2301 (opinion of THOMAS, J.). In a typical case, attendance at the established church was mandatory, and taxes were levied to generate church revenue. McConnell, Establishment and Disestablishment, at 2144-2146, 2152-2159. Dissenting ministers were barred from preaching, and political participation was limited to members of the established church. Id., at 2161-2168, 2176-2180.
This is not to say that the state establishments in existence when the Bill of Rights was ratified were uniform. As previously noted, establishments in the South were typically governed through the state legislature or State Constitution, while establishments in New England were administered at the municipal level. See supra, at 1835 - 1836. Notwithstanding these variations, both state and local forms of establishment involved "actual legal coercion," Newdow, supra, at 52, 124 S.Ct. 2301 (opinion of THOMAS, J.): They exercised government power in order to exact financial support of the church, compel religious observance, or control religious doctrine.
*609 None of these founding-era state establishments remained at the time of Reconstruction.
*1838 But even assuming that the framers of the Fourteenth Amendment reconceived the nature of the Establishment Clause as a constraint on the States, nothing in the history of the intervening period suggests a fundamental transformation in their understanding of what constituted an establishment . At a minimum, there is no support for the proposition that the framers of the Fourteenth Amendment embraced wholly modern notions that the Establishment Clause is violated whenever the "reasonable observer" feels "subtle pressure," ante, at 1824 - 1825, 1825, or perceives governmental "endors[ement]," ante, at 1817 - 1818. For example, of the 37 States in existence when the Fourteenth Amendment was ratified, 27 State Constitutions "contained an explicit reference to God in their preambles." Calabresi & Agudo, Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?, 87 Tex. L.Rev. 7, 12, 37 (2008). In addition to the preamble references, 30 State Constitutions contained other references to the divine, using such phrases as " 'Almighty God,' " " '[O]ur Creator,' " and " 'Sovereign Ruler of the Universe.' " Id., at 37, 38, 39, n. 104. Moreover, the state constitutional provisions that prohibited religious "comp [ulsion]" made clear that the relevant sort of compulsion was legal in nature, of the same type that had characterized founding-era establishments.[2] These provisions *610 strongly suggest that, whatever nonestablishment principles existed in 1868, they included no concern for the finer sensibilities of the "reasonable observer."
Thus, to the extent coercion is relevant to the Establishment Clause analysis, it is actual legal coercion that counts-not the "subtle coercive pressures" allegedly felt by respondents in this case, ante, at 1819 - 1820. The majority properly concludes that "[o]ffense ... does not equate to coercion," since "[a]dults often encounter speech they find disagreeable[,] and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views in a legislative forum." Ante, at 1826. I would simply add, in light of the foregoing history of the Establishment Clause, that "[p]eer pressure, unpleasant as it may be, is not coercion" either. Newdow, 542 U.S., at 49, 124 S.Ct. 2301 (opinion of THOMAS, J.).

The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

See Assn. of Statisticians of Am. Religious Bodies, C. Grammich et al., 2010 U.S. Religion Census: Religious Congregations & Membership Study 400-401 (2012).

It appears that there is one non-Christian house of worship, a Buddhist temple, within the town's borders, but it was not listed in the town directory. 732 F.Supp.2d, at 203. Although located within the town's borders, the temple has a Rochester mailing address. And while the respondents "each lived in the Town more than thirty years, neither was personally familiar with any mosques, synagogues, temples, or other non-Christian places of worship within the Town." Id ., at 197.

For example, when a rabbi first delivered a prayer at a session of the House of Representatives in 1860, he appeared "in full rabbinic dress, 'piously bedecked in a white tallit and a large velvet skullcap,' " and his prayer "invoked several uniquely Jewish themes and repeated the Biblical priestly blessing in Hebrew." See Brief for Nathan Lewin as Amicus Curiae 9. Many other rabbis have given distinctively Jewish prayers, id ., at 10, and n. 3, and distinctively Islamic, Buddhist, and Hindu prayers have also been delivered, see ante, at 1820 - 1821.

See, e.g ., prayer practice of Saginaw City Council in Michigan, described in Letter from Freedom from Religion Foundation to City Manager, Saginaw City Council (Jan. 31, 2014), online at http://media.mlive. com/saginawnews_impact/other/Saginaw% 20prayer% 20at% 20meetings% 20letter.pdf (all Internet materials as visited May 2, 2014, and available in Clerk of Court's case file); prayer practice of Cobb County commissions in Georgia, described in Pelphrey v. Cobb County, 410 F.Supp.2d 1324 (N.D.Ga.2006).

For example, at the most recent Presidential inauguration, a minister faced the assembly of onlookers on the National Mall and began with those very words. 159 Cong. Rec. S183, S186 (Jan. 22, 2013).

See generally Brief for Robert E. Palmer as Amicus Curiae (Nebraska Legislature chaplain at issue in Marsh ); e.g., id., at 11 (describing his prayers as routinely referring "to Christ, the Bible, [and] holy days"). See also Chambers v. Marsh, 504 F.Supp. 585, 590, n. 12 (D.Neb.1980) ("A rule of the Nebraska Legislature requires that 'every member shall be present within the Legislative Chamber during the meetings of the Legislature ... unless excused....' Unless the excuse for nonattendance is deemed sufficient by the legislature, the 'presence of any member may be compelled, if necessary, by sending the Sergeant at Arms' " (alterations in original)).

G. Wills, Inventing America: Jefferson's Declaration of Independence 46 (1978).

N. Cousins, In God We Trust: The Religious Beliefs and Ideas of the American Founding Fathers 4-5, 13 (1958).

M. Puls, Samuel Adams: Father of the American Revolution 160 (2006).

Letter to Abigail Adams (Sept. 16, 1774), in C. Adams, Familiar Letters of John Adams and His Wife Abigail Adams, During the Revolution 37 (1876).

Ibid.

See G. Wills, supra, at 46; J. Miller, Sam Adams 85, 87 (1936); I. Stoll, Samuel Adams: A Life 7, 134-135 (2008).

C. Adams, supra, at 37.

Ibid.

Ibid. ; see W. Wells, 2 The Life and Public Services of Samuel Adams 222-223 (1865); J. Miller, supra, at 320; E. Burnett, The Continental Congress 40 (1941); M. Puls, supra, at 161.

First Prayer of the Continental Congress, 1774, online at http://chaplain.house.gov/archive/continental.html.

1 Annals of Cong. 24-25 (1789); R. Cord, Separation of Church and State: Historical Fact and Current Fiction 23 (1982).

1 Annals of Cong. 247, 424; R. Labunski, James Madison and the Struggle for the Bill of Rights 240-241 (2006).

That principle meant as much to the founders as it does today. The demand for neutrality among religions is not a product of 21st century "political correctness," but of the 18th century view-rendered no less wise by time-that, in George Washington's words, "[r]eligious controversies are always productive of more acrimony and irreconciliable hatreds than those which spring from any other cause." Letter to Edward Newenham (June 22, 1792), in 10 Papers of George Washington: Presidential Series 493 (R. Haggard & M. Mastromarino eds. 2002) (hereinafter PGW). In an age when almost no one in this country was not a Christian of one kind or another, Washington consistently declined to use language or imagery associated only with that religion. See Brief for Paul Finkelman et al. as Amici Curiae 15-19 (noting, for example, that in revising his first inaugural address, Washington deleted the phrase "the blessed Religion revealed in the word of God" because it was understood to denote only Christianity). Thomas Jefferson, who followed the same practice throughout his life, explained that he omitted any reference to Jesus Christ in Virginia's Bill for Establishing Religious Freedom (a precursor to the Establishment Clause) in order "to comprehend, within the mantle of [the law's] protection, the Jew and the Gentile, the Christian and Mahometan, the Hindoo, and infidel of every denomination." 1 Writings of Thomas Jefferson 62 (P. Ford ed. 1892). And James Madison, who again used only nonsectarian language in his writings and addresses, warned that religious proclamations might, "if not strictly guarded," express only "the creed of the majority and a single sect." Madison's "Detached Memoranda," 3 Wm. & Mary Quarterly 534, 561 (1946).

Because Justice ALITO questions this point, it bears repeating. I do not remotely contend that "prayer is not allowed" at participatory meetings of "local government legislative bodies"; nor is that the "logical thrust" of any argument I make. Ante, at 1818 - 1819. Rather, what I say throughout this opinion is that in this citizen-centered venue, government officials must take steps to ensure-as none of Greece's Board members ever did-that opening prayers are inclusive of different faiths, rather than always identified with a single religion.