KAREN NELSON MOORE, Circuit Judge,
dissenting.
DISSENT
When Peter Bormuth voiced his. objection to the Jackson County Board of Commissioners’ practice of opening public meetings with exclusively Christian prayers, a Jackson County Commissioner made a disgusted face at Bormuth and turned his chair around, refusing to listen. R. 10 (Am. Compl. ¶ 31) (Page ID #69). One Commissioner called Bormuth a “nitwit” for questioning the prayer practice. County of Jackson, Personnel & Finance Committee November 12, 2013 Jackson County, MI, YouTube (Dec. 19, 2013), http:// tinyurl.com/2013novl2 (43:29—43:35). One Commissioner referred to Bormuth’s objection, as an attack on “my lord and savior Jesus Christ.” R. 14 (Pl. First Mot. for Summ. J., Ex. C) (Page ID #149); see also County of Jackson, Personnel & Finance Committee November 12, 2013 Jackson County, MI, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (32:50-32:59) (characterizing Bormuth’s challenge to the prayer practice as “an attack on Christianity and Jesus Christ, period”). The Commissioners, all of whom are Christian, refused to allow any non-Commissioners to give prayers, and did so in order to avoid hearing prayers they would not like. See County of Jackson, Personnel & Finance Committee November 12, 2013 Jackson County, MI, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (37:47-38:16). When Bormuth sought to join the County’s Solid Waste Planning Commission and then the Board of Public Works, the Commissioners denied his applications. The district court denied Bormuth the opportunity *526 to depose the Commissioners about why they rejected Bormuth’s applications, see R. 59 (Dist. Ct. Order Granting Mot. to Quash at 2—3) (Page ID #1045—46), but there is reason to believe that they did so because Bormuth objected to the practice of opening public meetings with Christian prayers, see R. 10 (Am. Compl. ¶ 33) (Page ID #69).
There is no doubt that some legislative prayer practices are constitutional. See Town of Greece v. Galloway, — U.S. —, 134 S.Ct. 1811, 1828, 188 L.Ed.2d 835 (2014); Marsh v. Chambers, 463 U.S. 783, 795, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). The question in this case is whether the undisputed constitutionality of a practice of solemn, respectful, chaplain-led prayer should protect the Jackson County Board of Commissioners’ prayer practice, which involves having local Commissioners themselves direct the public to participate in prayers; offering prayers from only one faith tradition, Christianity; affirmatively excluding non-Christians from the opportunity to offer prayers or invocations; publicly deriding citizens who voice their objections to the Commissioner-led and exclusively Christian prayer practice; and denying public positions to citizens who object to the prayer practice. Town of Greece demands that courts distinguish solemn, respectful practices from practices that “denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion.” 134 S.Ct. at 1823. Instead, the majority extends the constitutional protection meant for solemn and respectful prayer traditions to a practice that excludes non-Christians from the prayer opportunity and expresses disgust at people who voice a different opinion. I respectfully dissent.
I. BACKGROUND
Each meeting of the Jackson County Board of Commissioners begins with a call to order, after which the Chairman directs those in attendance to “rise” and “assume a reverent position.” R. 10 (Am. Compl. ¶¶ 17, 19) (Page ID #64—65). Then one of the Commissioners—all of whom are Christian—delivers a prayer. Id. ¶¶ 19-23 (Page ID #64-66). The Commissioners always end their prayer in the name of Jesus Christ. County of Jackson, Personnel & Finance Committee November 12, 2013 Jackson County, MI, YouTube (Dec. 19, 2013), http://tinyurl.com/2013novl2 (“Every board member here who gets up there and says a prayer during invocation, we end our invocation in the name of Jesus Christ.”). Immediately after the prayer, the Board of Commissioners invites residents, often children, to lead attendees in the Pledge of Allegiance. Id. ¶ 17 (Page ID #64). The Board of Commissioners’ meetings are open to the public and, for citizens who are unable to attend, are videotaped and posted on Jackson County’s website. Id. ¶ 16 (Page ID #64).
Bormuth is a self-described Pagan and Animist. Id. ¶ 13 (Page ID #63). Deeply concerned with environmental issues, Bor-muth started attending the Board of Commissioners’ monthly meetings because he believed that the County was releasing pollutants into a local river. Id. In July 2013, Bormuth attended the Board of Commissioners’ meeting to speak about closing the Jackson County Resource Recovery Facility, the mass-burn waste combustor that he believed was polluting the local river. Id. ¶ 25 (Page ID #66-67). At the meeting, after the Chairman said “all rise,” one of the Commissioners gave the following prayer:
Bow your heads with me please. Heavenly father we thank you for this day and for this time that we have come together. Lord we ask that you would be with us while we conduct the business of *527 Jackson County. Lord help us to make good decisions that will be best for generations to come. We ask that you would bless our troops that protect us near and far, be with them and their families. Now Lord we wanna [sic] give you all the thanks and all the praise for all that you do. Lord I wanna [sic] remember bereaved families tonight too, that you would be with them and take them through difficult times. We ask these things in your son Jesus’s name. Amen.
Id. ¶ 23 (Page ID #65-66). As a Pagan and an Animist, Bormuth was uncomfortable with the Commissioner’s prayer. Id. ¶ 24 (Page ID #66). He felt like he was being forced to participate in a religion to which he did not subscribe in order to bring a matter of concern to his local government. Id.
Bormuth attended the Board of Commissioners’ August 2013 meeting as well. Id. ¶ 28 (Page ID #68). A Commissioner opened the meeting with the following prayer:
Please rise. Please bow our heads. Our heavenly father we thank you for allowing us to gather here in your presence tonight. We ask that you watch over us and keep your guiding hand on our shoulder as we deliberate tonight. Please protect and watch over the men and women serving this great nation, whether at home or abroad, as well as our police officers and firefighters. In this we pray, in Jesus name, Amen.
Id. During the prayer, Bormuth was the only one in attendance who did not rise and bow his head. Id. ¶ 29 (Page ID #68). Bormuth felt isolated, and he worried that the Board of Commissioners would hold against him his decision to stay seated. Id.
During the meeting’s public-comment period, Bormuth explained that he thought that the monthly prayers violated the Establishment Clause. Id. ¶ 31 (Page ID #69). While Bormuth was speaking, one of the Commissioners “made faces expressing his disgust” and then turned his chair around, refusing to look at Bormuth while he spoke. Id. The Commissioner’s reaction “confirm[ed] [Bormuth’s] fear[]” that his refusal to join the prayers would prejudice the Board of Commissioners against him. Id.
Bormuth filed suit against the County ten days later, alleging that the prayer practice violated the Establishment Clause. R. 1 (Compl.) (Page ID #1). While Bormuth’s suit was pending before the district court, the Board of Commissioners nominated residents to the County’s new Solid Waste Planning Committee. R. 10 (Am. Compl. ¶ 33) (Page ID #69). Although Bormuth had applied to serve on the Solid Waste Planning Committee, and had three years of experience working on related issues, the Board of Commissioners did not nominate him. Id. Bormuth surmised that this had something to do with his suit against the County. Indeed, an article published shortly after Bormuth filed his federal complaint revealed the Commissioners’ disapproval of the suit, quoting one Commissioner as saying, “Bormuth ‘is attacking us and, from my perspective, my Lord and savior Jesus Christ,’ ” and another Commissioner as remarking, “All this political correctness, after a while I get sick of it.” R. 14 (Pl. First Mot. for Summ. J., Ex. C) (Page ID #149).
Bormuth filed an amended complaint addressing the Board of Commissioners’ decision not to nominate him to the Solid Waste Planning Committee. R. 10 (Am. Compl. ¶ 33) (Page ID #69). He again alleged that the County was violating the Establishment Clause and asked for declaratory and injunctive relief as well as nominal damages. Id. ¶¶ 37, 44-50 (Page ID #70-71, 83-84). The parties filed motions for summary judgment. Bormuth *528 moved for summary judgment before the Supreme Court decided Town of Greece and then, after Town of Greece, the parties filed cross-motions addressing that case. See R. 25 (Def. Mot. for Suram. J.) (Page ID #244); R. 37 (Pl. Second Mot. for Summ. J.) (Page ID #509).
While the parties were briefing their motions for summary judgment, they were also embroiled in two discovery disputes. The first dispute involved Bormuth’s efforts to take depositions. Bormuth sent the County notices of his intent to depose the Commissioners, R. 24-2 (Notices of Deps.) (Page ID #226), in order to obtain “information relating to [Bormuth’s] activities regarding the Jackson County Resource Recovery Facility,” as well as information on the Board of Commissioners’ practice of opening meetings with prayer and on its use of children to lead the Pledge of -Allegiance-following the prayer, R. 24-3 (Pl. Corrected Rule 26(a)(1) Disclosures at 1) (Page ID #236). The County filed a motion to quash, arguing that it had already provided Bormuth with all the information that it had on its practice of opening meetings with prayer and on its use of children to lead the Pledge of -Allegiance, and that any information it had on Bormuth’s activities regarding the Jackson County Re-, source Recovery Facility was immaterial. R. 24 (Mot. to Quash at 3-7) (Page ID #213-17). In response, Bormuth stated that he also wanted to uncover the Commissioners’ motives in delivering the prayers. R. 26 (Resp. to Mot. to Quash at 7) (Page ID #296). The County replied that the -Commissioners’ motives were also immaterial. R. 28 (Reply re: Mot. to Quash at 1) (Page ID #306).
The second dispute involved Bormuth’s efforts to supplement the record. Bormuth sought to supplement the record with the text of a Commissioner’s October 2014 prayer, R. 42 (Pl. First.Mot. to Suppl. Record at 1) (Page ID #790), and with a letter he received from the Board of Commissioners denying him appointment to the Board of Public Works, R. 52 (Pl. Second Mot. to Suppl. Record at 1) (Page ID #932). The County objected to the first motion to supplement the record because the October 2014 prayer was similar to the prayers that Bormuth had included in his amended complaint. R. 43 (Resp. to Pl. First Mot. to Suppl. Record at 1-2) (Page ID #801-02). The County did not respond to the second motion to supplement the record, which, was filed just days before the magistrate judge issued.a Report and Recommendation.
The magistrate judge recommended that the district court deny Jackson County’s motion for summary, judgment and grant Bormuth’s motion for summary judgment because “the legislative prayer practice of the Jackson County Board of Commissioners violates the Establishment Clause.” R, 50 (R. & R. at 39) (Page ID #914). Rejecting this recommendation, the district court granted the county’s motion for summary judgment and denied not only Bormuth’s summary-judgmént motion but also' his discovéry motions. Beginning with the motion'to quash depositions, the district court agreed with the County that the information Bormuth sought in deposing the Commissioners—“information relating to [Bor-muth’s] activities regarding the Jackson County Resource Recovery Facility,” R. 24-3 (Pl. Corrected Rule 26(a)(1)’Disclosures at 1) (Page ID #236)—was not germane to the dispute, R. 59 (Dist. Ct. Order Granting Mot. to Quash at 2-3) (Page ID #1045-46). Confusing the Jackson County Resource Recovery Facility with the -Solid Waste Planning Committee (or possibly with the Board of Public Works), the district court-explained that because Bormuth “ha[d] not brought an employment discrimination claim,” “information regarding the Jackson County Resource Recovery *529 Facility’s failure to hire .him ... is'not relevant.” Id. The district court further stated that although Bormuth also sought information oii the Commissioners’ motives in giving the prayers, “motive is not a relevant factor.” Id. at 3 (Page ID #1046). The district court then granted Bormuth’s first motion to supplement the record with the Commissioner’s October 2014 prayer but denied Bormuth’s second motion to supplement the record with the letter that he received from the Board of Commissioners denying him appointment to the Board of Public Works. R. 60 (Dist. Ct. Order Re: Mots. to Suppl. Record at 2-3) (Page ID #1048-49). Conflating Bormuth’s second motion to supplement the record with his efforts to depose the Commissioners, the district court described the second motion to supplement the record as seeking to introduce “[Bormuth’s] application to a position on the Jackson County Resource Recovery Facility,” concluding that, “[bjecause [Bormuth’s] complaint makes no employment discrimination claim, instead advancing as the sole cause of action an Establishment Clause violation, his affidavit describing the Board’s failure to hire him is irrelevant.” Id. at 3 (Page ID #1049) (emphasis removed).
The district court then .turned to the merits of Bormuth’s Establishment Clause claim. The district court considered • the content of the Board of Commissioners’ prayers first, and concluded that, although the prayers were “exclusively Christian,” they were composed of only “benign religious references”—making Bormuth’s reaction to them “hypersensitive.” R. 61 (Dist. Ct. Op. at 7-8) (Page ID #1067-58). “The fact that all nine of the Commissioners are Christian,” the district court stated, “is immaterial, [because] [a]s elected officials, they were chosen as representatives whose interests were .most closely aligned with the public’s, and their personal beliefs are therefore a reflection of the community’s own overwhelmingly Christian demographic.” Id. at 7 (Page ID #1057). Turning to. whether the Board- of Commissioners’ practice was coercive, the district court noted that Bormuth could have left the room during the prayers, and that nothing in the record indicated that his absence would have been perceived as disrespectful. Id. at 12-13 (Page ID #1062-63): Accordingly, the district court held that '“Bormuth’s subjective sense- of affront resulting from exposure to sectarian- prayer is insufficient to sustain an Establishment Clause violation.” Id. at 13 (Page ID #1063) (emphasis removed). Although the district court acknowledged that' some citizens may not perceive statements such as “rise” and “assume a reverent position,” see, e.g., R. 10 (Am. Compl. ¶ 19) (Page ID #64-65), as the mere “voluntary invitations” that the district court believed they wére, the district court did not discuss the point further, R. 61 (Dist. Ct. Op. at 13-14) (Page ID #1063-64). As for the Commissioners’ treatment of Bor-muth, the district court stated that, though “evidence of disrespect,” the Commissioners’ treatment by turning their backs to him “does not demonstrate that the Board was prejudiced against him because he declined to participate in the prayer—rather, their behavior is likely an unfortunate expression of their own personal sense of affront elicited'by his sehtiments,” Id. at 15 (Page ID #1065).
II. ANALYSIS
A. Videos of Jackson County Board of . Commissioners’ Meetings
Some of the evidence that Bormuth presented to the district court comes from videos of the Jackson County Board of Commissioners’ meetings, which Jackson County records and posts online. Before analyzing Bormuth’s Establishment Clause *530 claims, I will explain why this court should consider the video evidence.
Before that, it is important to explain what the videos show. First, the videos reveal that the Board of Commissioners decided not to let guest ministers or members of the public offer opening prayers at their meetings because they were concerned about “certain people com[ing] up here and say[ing] things that they are not going to like.” County of Jackson, Personnel & Finance Committee November 12, 2013 Jackson County, MI, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (38:02-38:16). A Commissioner characterized allowing anyone other than the Commissioners themselves to give prayers as “opening a Pandora’s Box.” Id. After this discussion, the Commissioners decided to continue giving the prayers themselves, at least for the time being, to avoid hearing “things that they are not going to like.” Id. at 38:02-38:16, 46:51-47:25. Second, the videos reveal that during a two-year span, the Board of Commissioners prayed at every meeting except the one that no members of the public attended. See County of Jackson, November 6, 2014 Special Jackson County Board of Commissioners Meeting Video, YouTube (Nov. 7, 2014), http://tinyurl.com/2014nov6 (0:01-0:47). This pattern undercuts the argument that the prayers were intended for the Commissioners themselves, not the public. The facts contained in these videos are relevant to a “fact-sensitive” inquiry that “considers both the setting in which the prayer arises and the audience to whom it is directed,” as Town of Greece requires. Town of Greece, 134 S.Ct. at 1825.[1]
Despite the majority’s argument to the contrary, these videos are part of the record. Bormuth called the district court’s attention to the videos.[2] Bormuth’s pleadings notified the district court about the County’s practice of recording the Board of Commissioners’ meetings and posting the videos online, and repeatedly referenced the existence of the videos and events from the meetings. See R. 10 (Am. Compl. ¶ 16) (Page ID #64) (informing the *531 district court that the County records the Board of Commissioners’ meetings and posts the videos on the County’s website); R. 29 (Pl. Resp. to Def. Mot. for Summ. J. at 11-16) (Page ID #328-33) (reciting what happened at several Board of Commissioners’ meetings, videos of which the County posts online); R. 37-1 (Pl. Mot. for Summ. J., Ex. J) (Page ID #611-614) (including transcripts of three Board of Commissioners’ meetings and stating that the County posts videos of Board of Commissioners’ meetings online). Including these repeated references to the videos and pointing the district court to the website where the County posted the videos was enough to make them part of the record.[3]
Even if these videos are not part of the record, the Federal Rules of Evidence require this court to take judicial notice of them. “The court ... must take judicial notice” of “a fact that is not subject to reasonable dispute” “if a party requests it and the court is supplied with the necessary information.” Fed. R. Evid. 201(b), (c). A fact “is not subject to reasonable dispute” if it “can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.” Fed. R. Evid. 201(b)(2). “The court may take judicial notice at any stage of the proceeding.” Fed. R. Evid. 201(d). As the majority acknowledges, Jackson County admitted the accuracy of these videos, making the facts contained within not subject to reasonable dispute, Bormuth brought the videos to the attention of the district court (and this court) and supplied the necessary information by pointing the court to Jackson County’s YouTube page, where the county publicly posts the videos. As a re-suit, the district court should have at least taken judicial notice of the videos. Because a court can take judicial notice at any point in .the proceedings, the district court’s failure to take judicial notice of the videos does not affect this court’s obligation to take judicial notice of the videos.
The majority attempts to skirt the requirement to take judicial notice of the videos by pointing to an apparent tension between the rule that appellate courts must take judicial notice of facts not subject to reasonable dispute if a party so requests and supplies the necessary information, and the rule that appellate courts cannot consider evidence that was not before the district- court. Maj. Op. at 501. Even if this tension exists in some cases, it does not exist here. This tension stems from the concern that appellate courts should not review “a better case fashioned after a district court’s unfavorable order.” Id. (quoting DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden, 448 F.3d 918, 922 (6th Cir. 2006)). In this case', Bormuth called the district court’s attention to the videos and the facts contained therein. The videos are not part of a better case fashioned for appeal, but part of the very ease that Bormuth presented to the district court. The majority’s argument that “[o]ne need look no further than the opinions of the magistrate judge and district judge to confirm” that “Bormuth did not present any video evidence to the district court” gets it backward. Maj. Op. at 500. The district court’s failure to consider the videos does not mean that Bormuth erred by not presenting the videos to the district court, it means that the district court erred by not considering the videos that Bormuth presented.[4] The district *532 court’s error in refusing to consider all the facts does not preclude this court, in reviewing the district court, frbm considering facts that the district court erroneously-ignored.
B. Establishment Clause framework
Marsh and Town of Greece establish that legislative-prayer claims occupy a unique place in First Amendment jurisprudence, and that the question whether a legislative prayer practice violates the Establishment Clause is a fact-sensitive inquiry. Marsh, the first Supreme Court case to consider a legislative-prayer claim, bypassed the.Court’s previously constructed tests for, Establishment Clause violations,, reasoning that because “the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom,” from “colonial times through-the founding of the Republic and ever since,” those tests did not apply. 463 U.S. at 786, 103 S.Ct. 3330. The Court held that a new formal test was unnecessary. As the Court explained, “[t]o invoke Divine' guidance on a public body entrusted with making the laws is not, in these circumstances, an ‘establishment’ of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely ■ held among the people of this country,” Id. at 792, 103 S.Ct. 3330. Although-the Court still asked 'whether any features of the practice before- it violated the Establishment Clause, it evaluated the parties’ arguments “against the historical back.ground” of legislative prayer. Id. at 792-93, 103 S.Ct. 3330.
Town of Greece confirmed that “Marsh stands for the proposition that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted.” 134 S.Ct. at 1819. However, Toimi of Greece .cautioned that “Marsh must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation.” Id. “The case teaches instead that the.Establishment Clause must be interpreted ‘by reference to historical practices and understandings.’ ” Id. (quoting Cty. of Allegheny v. Am. Civil Liberties Union, Greater Pittsburgh Chapter, 492 U.S. 573, 670, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (Kennedy, J., concurring in judgment in part and dissenting in part)). Following the framework set forth in Marsh, the Court in Town of Greece considered whether the legislative prayer before it “fit[ ] within the tradition long followed in Congress and the state legislatures.” Id. Town of Greece also asked whether the prayer violated the Establishment Clause by being coercive. Id. at 1825 (controlling opinion).
As the eh banc Fourth Circuit recently pointed out, Marsh and Town of Greece “in no way sought to dictate the outcome of every subsequent case.” Lund v. Rowan Cty., 863 F.3d 268, 276 (4th Cir. 2017) (en banc). “The Court acknowledged that it has not ‘define[d] the precise boundary of the Establishment Clause.’ Accordingly, when the historical principles articulated by the Supreme Court do not direct a particular result, a court must conduct a ‘fact-sensitive’ review of the prayer practice.” Id. (quoting Town of Greece, 134 S.Ct. at 1819, 1825). Thus, we must determine whether the Board of Commissioners’ practice is shnilar to the practices upheld in Marsh and Town of Greece or if there are critical differences that take the Board of Commissioners’ practice outside the ambit of historically tolerated legisla *533 tive prayer, either because it dees not fit within the protected historical practice or because it is coercive.
1. Historical tradition
The first half of Justice Kennedy’s opinion in Town of Greece, which addressed the historical tradition of legislative prayer, garnered a majority of the court. The Court held insistence on inclusive and ecumenical prayer was inconsistent with Marsh. Town of Greece, 134 S.Ct. at 1820—24. The Court explained that Marsh had held that the use of prayer to open legislative sessions was constitutional not because the prayer was nonsectarian, but because “prayer in this limited context could ‘coexist with the principles of disestablishment and religious freedom.’ ” Id. at 1820 (alteration omitted) (quoting Marsh, 463 U.S. at 786, 103 S.Ct. 3330). The Court also noted, however, that there were still constraints on the content of legislative prayer. Id. at 1823. These constraints came from the prayer’s purpose, which is to solemnize the legislative session. Id. If the prayer’s content strayed from this purpose, the prayer would no longer be consistent with the First Amendment. But “[a]bsent a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose, a challenge based solely on the content of a prayer [would] not likely establish a constitutional violation,”[5] Id. at 1824.
2. Coercion
The second half of Justice Kennedy’s opinion addressed coercion. Justice Kennedy’s plurality opinion[6] considered the argument that the town’s practice was coercive because it pressured members of the public to participate in the prayers in order to appease town board members. Id. at 1824-28 (controlling opinion). Justice Kennedy’s opinion agreed that this kind of pressure was problematic, stating that “[i]t is an elemental First Amendment principle that government may not coerce its citizens ‘to support or participate in any religion or fits exercise.’ ” Id. at 1825 (quoting Cty. of Allegheny, 492 U.S. at 659, 109 S.Ct. 3086 (Kennedy, J., concurring in judgment in part and dissenting in part)).
However, the opinion stated that there was- no evidence of coercion in the record. The opinion explained that the inquiry into whether the government has engaged in such coercion is “a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed.” Id. By “offering a brief, solemn, and respectful prayer to open its monthly meetings,” the Town of 'Greece had not “compelled its citizens to engage in a religious observance.” Id. “[Legislative prayer,” the opinion explained, “has become part of our heritage and tradition,” and “[i]t is presumed that the reasonable observer 'is acquainted with this tradition and understands that its purposes are to lend gravity to public proceedings. and to acknowledge the place religion holds in the lives of many private citizens, not to afford government an opportunity to proselytize.” Id, The opinion determined that there was nothing in the record about, the setting of the prayer .that undermined this presump *534 tion. Id. As for the principal audience to whom the prayer was directed, the opinion explained that it is presumed that the principal audience is the lawmakers themselves, because legislative prayer is “an internal act” in which government officials invoke the divine for their own benefit rather than to promote religion to the public. Id. (quoting Chambers v. Marsh, 504 F.Supp. 585, 588 (D. Neb. 1980)). Again, the opinion determined that there was nothing in the record about the principal audience that undermined this presumption. Id. at 1825-26.
The opinion then observed, importantly for our purpose, that “[t]he analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person’s acquiescence in the prayer opportunity.” Id. at 1826.
C. The district court abused its discretion by denying discovery to Bor-muth
Because Town of Greece establishes that the legislative prayer inquiry is fact-sensitive, before discussing whether Jackson County’s prayer practice falls within the historically protected practice of legislative prayer, I first address the district court’s rulings on Bormuth’s requests for discovery. This court reviews for an abuse of discretion both a district court’s ruling on a motion to quash and its ruling on a motion to supplement the record. Guy v. Lexington-Fayette Urban Cty. Gov’t, 624 Fed.Appx. 922, 928 (6th Cir. 2015) (motion to quash); see Duha v. Agrium, Inc., 448 F.3d 867, 882 (6th Cir. 2006) (motion to supplement the record). “An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment.” Louzon v. Ford Motor Co., 718 F.3d 556, 560 (6th Cir. 2013) (quoting Miller v. Countrywide Bank, N.A. (In re Countrywide Fin. Corp. Mortg. Lending Practices Litig.), 708 F.3d 704, 707 (6th Cir. 2013)).
In granting the County’s motion to quash the depositions of the Commissioners, the district court concluded that because Bormuth “ha[d] not brought an employment discrimination claim,” “information regarding the Jackson County Resource Recovery Facility’s failure to hire him ... is not relevant.” R. 59 (Dist. Ct. Order Granting Mot. to Quash at 2-3) (Page ID #1045-46). This was a misapprehension of the facts. Bormuth had not sought information regarding the Jackson County Resource Recovery Facility’s failure to hire him. He had sought information about his efforts to close it: the Jackson County Resource Recovery Facility was the mass-burn waste combu-stor that Bormuth believed was polluting the local river. R. 24-3 (Pl. Corrected Rule 26(a)(1) Disclosures at 1) (Page ID #236). The district court also concluded that, to the extent that Bormuth sought information on the Commissioners’ motives in giving the prayers, “motive is not a relevant factor.” R. 59 (Dist. Ct. Order Granting Mot. to Quash at 3) (Page ID #1046). This was a misapplication of the law. The Commissioners’ purpose in delivering the prayers is highly relevant, because legislative prayer that is intended to proselytize may violate the Establishment Clause by coercing citizens to support and participate in the exercise of religion. Town of Greece, 134 S.Ct. at 1825-26 (controlling opinion). The district court’s order, therefore, was an abuse of discretion.
In denying Bormuth’s second motion to supplement the record, which asked the *535 district court to consider the letter that Bormuth received from the Board of Commissioners denying him appointment to the Board of Public Works, the district court also misapprehended the facts and misapplied the law. The district court characterized Bormuth’s second motion to supplement the record as seeking to introduce “his application to a position on the Jackson County Resource Recovery Facility.” R. 60 (Dist. Ct. Order Re: Mots. to Suppl. Record at 3) (Page ID #1049). But as explained above, Bormuth never applied for a position at the Jackson County Resource Recovery Facility; he attempted to close it. His second motion to supplement the record concerned his application to the Board of Public Works. R. 52 (Pl. Second Mot. to Suppl. Record at 1) (Page ID #932). The district court then concluded that “[b]ecause [Bormuth’s] complaint makes no employment discrimination claim, instead advancing as the sole cause of action an Establishment Clause violation, [the letter and] affidavit describing the Board’s failure to hire him [are] irrelevant.” R. 60 (Dist. Ct. Order Re: Mots. to Suppl. Record at 3) (Page ID #1049) (emphasis removed). But the letter and affidavit are relevant—they speak to whether the Board of Commissioners is allocating benefits and burdens based on citizens’ participation in the prayers, which is a critical part of the analysis of legislative-prayer claims. See Town of Greece, 134 S.Ct. at 1826 (controlling opinion). Therefore, the district court’s order denying the motion to supplement the record was also an abuse of discretion.
Despite the fact that the district court misapprehended both the facts and the law, the majority concludes that the district court “did not abuse its discretion” in denying Bormuth’s discovery motions because “Bormuth failed to comply with Federal Rule of Civil Procedure 56(d).” Maj. Op. at 502. The majority adds that “[a]lthough we have set aside Rule 56(d)’s formal affidavit requirement ‘when a party has clearly explained its need for more discovery on a particular topic to the district court prior to or contemporaneously with the motion for summary judgment,’ there is no need to do so here” because Bormuth himself moved for summary judgment. Maj. Op. at 502 (quoting Unan v. Lyon, 853 F.3d 279, 293 (6th Cir. 2017)).[7] Contrary to the majority’s assertion, this is precisely the type of situation that calls for setting aside Rule 56(d)’s formal affidavit requirement. The majority errs, for two reasons, when it attempts to justify its refusal to set aside Rule 56(d)’s formal affidavit requirement by construing Bormuth’s summary-judgment motions as a concession that there are no disputed material facts.
First, Bormuth moved for summary judgment by arguing that legislator-led, exclusively Christian prayer at local government meetings is always unconstitutional. Because there is no dispute that Jackson County Commissioners lead prayers before Board of Commissioners’ meetings, or that the prayers are sectarian and exclusively Christian, no further factual development would be necessary to award Bormuth summary judgment on this theory. However, even if, contrary to the *536 broader version of Bormuth’s argument, some legislator-led prayer at local government meetings is constitutional, Jackson County’s prayer practice could be unconstitutional pursuant to a narrower argument, under 'the fact-sensitive inquiry Town of Greece requires. Bormuth’s motion for summary judgment arguing that legislator-led, ‘exclusively Christian prayer at local government- meetings is always unconstitutional is not a concession that there are no disputed material facts as to an alternative, narrower argument that Jackson County’s prayer practice is unconstitutional because of facts specific to theft prayer practice.
The second reason is related to the first. Courts must construe pro se pleadings liberally. Spotts v. United States, 429 F.3d 248, 250 (6th Cir. 2005). This requirement underscores why we should not interpret Bormuth’s motions for summary judgment on .a broader theory as a concession that there are no disputed facts as to a narrow? er theory, given that he also sought discovery to further develop the facts relevant to his narrower theory.[8] Because Bormuth specifically requested additional discovery and is a pro se litigant whose pleadings must be construed liberally, Bormuth’s motions for summary judgment do not justify the district court’s denial of Bormuth’s discovery motions.
The importance of these discovery motions bears emphasis. The. district court’s erroneous denial of Bormuth’s discovery motions deprived Bormuth of an opportunity to fairly litigate the constitutional issues he raised. The majority’s decision to affirm these denials is all the more disturbing when combined with its conclusion that the videos of Jackson County Board of Commissioners’ meetings are not part of the record. The majority couches its opinion in terms of Bormuth’s failure to carry his evidentiary burden, see Maj. Op. at 519, but it does so while refusing to consider much of the evidence that Bormuth has presented (the videos) and refusing to allow Bormuth to develop more probative evidence (to depose the Commissioners).
Town of Greece leaves.no question that a legislative prayer practice can cross a constitutional line, and that courts should review prayer practices to ensure that they do not fall outside of the tradition of solemn and respectful prayer , or coerce participation in a religious exercise. See Town of Greece, 134 S.Ct. at 1826-27. In my view, and as discussed more fully below, the facts currently before this court are enough to show that Jackson County’s prayer practice crosses a constitutional line. It is one thing for the majority here to disagree with me on this point. It is quite another thing for the majority to take the additional step of refusing to consider evidence that the legislators intended to proselytize, affirmatively excluded non-Christian prayer givers, and discriminated against a citizen who objected to the prayer practice. The effect of deciding this case without considering either the County’s official video records or the additional evidence Bormuth might have uncovered in discovery is to insulate a practice from any judicial review even though it bears all the markings of an attempt to isolate and denigrate non-Christians, or at least a callous disregard for the possibility of isolating and denigrating non-Christians.
*537 Di Jackson County’s prayer practice violates the Establishment Clause because it falls outside of the historical tradition identified in Marsh
Even without considering the videos and without the benefit of depositions of the Commissioners, it is clear to me that Jackson County’s prayer practice is unconstitutional. First, Jackson County’s practice does not fall within the historical tradition of legislative prayer identified in Marsh and Town of Greece. A combination of factors distinguishes this case from the practice upheld in Marsh and Town of Greece, including one important factor: the identity of the prayer giver. In Marsh, the Nebraska legislature opened its session with a prayer offered by a chaplain, 463 U.S. at 784, 103 S.Ct. 3330; in Town of Greece, invited clergy and laypersons delivered the invocations, 134 S.Ct. at 1816— 17. Here, the Jackson County Commissioners' give the prayers. See R. 10 (Am. Compl. ¶¶ 19-23) (Page ID #64-66). The difference is not superficial. See Town of Greece, 134 S.Ct. at 1826 (distinguishing solicitations to pray by guest ministers from those by town leaders, noting that “[t]he analysis would be different if town board members” themselves engaged in the same actions). When the Board of Commissioners opens its monthly meetings with prayers, there is no distinction between the government and the prayer giver: they are one and the same. The prayers, in Bormuth’s words, are literally “governmental speech.” R. 29 (Pl. Resp. to Def. Mot. for Summ. J. at 1) (Page ID #318).
Legislator-led prayer at the local level falls far afield of the historical tradition upheld in Marsh and Town of Greece. The setting—a local government meeting with constituent petitioners in the audience— amplifies the importance of the identity of the prayer giver in our analysis, and heightens the risks of coercion, as borne out by the facts in this case.
The identity of the prayer giver also leads to other problems with the Board of Commissioners’ practice. Because they are the ones delivering the prayers, the Commissioners—and only the Commissioners—are responsible for the prayers’ content. And because in Jackson County the prayer content is exclusively Christian, by delivering the prayers, the Commissioners are effectively endorsing a specific religion, Christianity. In Town of Greece, the Supreme Court upheld the town’s prayer practice in large part because it included prayers representing a variety of faiths. Although initially all of the prayer givers were Christian ministers, eventually the town invited a Jewish layman and the chairman of the local Baha’i temple to deliver invocations. See Town of Greece, 134 S.Ct. at 1817. When a Wiccan priestess asked for an opportunity to deliver the invocation, the town granted her request. Id. The Supreme Court emphasized that, “The town made reasonable efforts to identify all of the congregations located within its borders and represented that it would welcome a prayer by any minister or layman who wished to give one.” Id. at 1824; see also id. at 1829 (Alito, J., concurring) (“[T]he town made it clear that it would permit any interested residents, including nonbelievers, to provide an invocation, and the town has never refused a request to offer an invocation. ... The most recent list in the record of persons available to provide an invocation includes representatives of many non-Christian faiths.”). In Jackson County, by contrast, there is no opportunity for members of other faiths to offer invocations. See Lund, 863 F.3d at 278 (“The openness evinced by [the] elected bodies [in Marsh and Town of Greece] contrasts starkly with Rowan County’s policy of restricting the prayer opportunity to the commissioners alone.”). *538 Instead, there are exclusively Christian prayer givers and a pattern of explicitly Christian prayers.
What is more, in Jackson County the prayer givers are exclusively Christian because of an intentional decision by the Board of Commissioners. Unlike in Town of Greece, where the Court found no evidence of sectarian motive in the selection of speakers, at least one Jackson County Commissioner admitted that, in order to control the prayers’ content, he did not want to invite the public to give prayers.
At a November 2013 meeting of the Personnel <& Finance Committee, one of the Commissioners imagined what would happen if any Jackson County resident could lead the prayer:
We all know that any one of us could go online and become an ordained minister in about ten minutes. Um, so if somebody from the public wants to come before us and say that they are an ordained minister we are going to have to allow them as well.
County of Jackson, Personnel & Finance Committee November 12, 2013 Jackson County, MI, YouTube (Dec. 19, 2013), http://tinyurl.com/2013novl2 (37:47-38:01). He continued:
And I think we are opening a Pandora’s Box here because you are going to get members of the public who are going to come up at public comment and we are going to create a lot of problems here when certain people come up here and say things that they are not going to like.
Id. at 38:02-38:16. These comments reveal that the Board of Commissioners’ control over the content of the prayers is not just a function of the Commissioners’ role as prayer givers—it is the result of an affirmative decision by the Commissioners to exclude other prayer givers. In other words, the Board of Commissioners is limiting who can give the prayers in order to control the prayers’ content. And the effect of the Board of Commissioners’ decision is to prevent participation by religious minorities and to endorse a specific religion. This brings the County’s use of prayer to open its monthly meetings well outside the ambit of historically tolerated legislative prayer.
Arguing that Jackson County prayer practice is constitutional, the majority opines that legislator-led prayer falls within the historical tradition approved by Town of Greece because there are examples showing that legislators have long been permitted to offer prayers before state legislative sessions. But the majority, Defendant, and amici “elide the distinction between extending the prayer opportunity to lawmakers (as many legislatures do) and restricting it to those lawmakers (as [Jackson] County did here).” Lund, 863 F.3d at 279. The majority, Defendant, and amici have not cited a single example of local legislative prayer practices limited exclusively to legislators themselves. The present-day example of the Rhode Island state legislature, Maj. Op. at 511, being both contemporary and at the state level, does not suffice. Maj. Op. at 509-11. Thus, even if there were a tradition of legislator-led prayer at the state level, this tradition would not mean that legislator-led prayer at local government meetings is constitutionally permissible. Nor would it mean that legislator-led prayer is constitutionally permissible even if each and every legislator offered sectarian prayers in the same faith tradition. Nor, especially, would it mean that exclusively legislator-led prayer is constitutionally permissible when it involves a combination of these factors, taking place at local government meetings where each and every legislator offered sectarian prayers in the same faith tradition.
*539 The majority also errs by seeking to analyze each feature of Jackson County’s prayer practice separately. The Supreme Court has rejected this “divide-and-conquer” approach to analyzing the constitutionality of multi-faceted practices, United States v. Arvizu, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), and specifically has held that legislative prayer practices must be evaluated based on a totality of the circumstances, Town of Greece, 134 S.Ct. at 1823; see also Lund, 863 F.3d at 289 (Individuals “are not experiencing the prayer practice piece by piece by piece. It comes at them whole. It would seem elementary that a thing may be innocuous in isolation and impermissible in combination. In fact, the lead [Fourth Circuit] dissent’s tired ‘divide and conquer’ strategy has been frowned upon by the Supreme Court itself.”) (citing Arvizu, 534 U.S. at 274, 122 S.Ct. 744). Even if each piece of Jackson County’s prayer practice is constitutionally permissible, that does not mean that the prayer practice as a whole is constitutional.
The majority also points out that the people of Jackson County can diversify the Board of Commissioners’ prayer practice by electing Commissioners of different faiths, or no faith. Maj. Op. at 513. The majority apparently intends for this argument to be a defense of Jackson County’s prayer practice, but really it is the worst case scenario. Voting for representatives based on what prayers they say is precisely what the First Amendment’s religion clauses seek to prevent. See Lund, 863 F.3d at 282 (“For any Buddhists, Hindus, Jews, Muslims, Sikhs, or others who sought some modest place for their own faith or at least some less insistent invocation of the majority faith, the only recourse available was to elect a commissioner with similar religious views. We find this point troubling. [V]oters may wonder what kind of prayer a candidate of a minority religious persuasion would select if elected. Failure to pray in the name of the prevailing faith risks becoming a campaign issue or a tacit political debit, which in turn deters those of minority faiths from seeking office. Further, allowing the county to restrict to one the number of faiths represented at Board meetings would warp our inclusive tradition of legislative prayer into a zero-sum game of competing religious factions. Our Constitution safeguards religious pluralism; it does not sanction activity which would take us one step closer to a de facto religious litmus test for public office.”) (internal quotation marks and citations omitted) (alteration in original); see also W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (“The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One’s right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.”).
E. Jackson County’s prayer practice violates the Establishment Clause because it is coercive
Jackson County’s prayer practice is unconstitutional for another reason, because it is coercive. Justice Kennedy’s opinion in Town of Greece held that, “[i]t is an elemental First Amendment principle that government may not coerce its citizens ‘to support or participate in any religion or its exercise.’ ” 134 S.Ct. at 1825 (quoting Cty. of Allegheny, 492 U.S. at 659, 109 S.Ct. 3086 (Kennedy, J., concurring in judgment in part and dissenting in part)).
*540 As a threshold matter, I emphasize that Justice Kennedy’s -concurrence is the controlling Town of Greece opinion. A majority of this court appears to agree that Justice Kennedy’s opinion controls, although a few judges have stated their view that Justice Thomas’s opinion controls. See Maj. Op. at 515 n.10. The parties in this .case agree that Justice Kennedy’s opinion controls, as . Jackson County conceded at the en banc stage that Justice Kennedy’s opinion is controlling. Judges from our sister circuit overwhelmingly agree that Justice Kennedy’s opinion controls: in Lund, although the judges of the Fourth Circuit robustly debated how to apply. Justice Kennedy’s opinion to the facts before them, no judge took the position that Justice Thomas’s opinion was controlling. See Lund, 863 F.3d at 297-99 (Niemeyer, J., dissenting); id. at 319-21 (Agee, J., dissenting). Finally, Supreme Court and Sixth Circuit precedent dictate that Justice Kennedy’s opinion is controlling.[9]
Applying Justice Kennedy’s opinion, I emphasize that the inquiry into whether á prayer practice is coercive is “a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed.” Town of Greece, 134 S.Ct. at 1825. Although the Court in Town of Greece concluded that there was no evidence of coercion in the record before it, it held that “[t]he analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person’s acquiescence in the prayer opportunity.” Id. at 1826.'All three elements are present here.
First, the Board of Commissioners directs the public to participate in the prayers at every monthly meeting. As the Supreme Court has observed, the source of these statements is significant. In Town of Greece, “board members themselves stood, bowed their heads, or made the sign of the cross during 'the prayer,” but “they at no point solicited similar gestures by the public.” Id. (emphasis added). Rather, it was the clergy who asked audience members to participate in the prayer. Id. The Supreme Court reasoned that, because this direction *541 came from the clergy, it was inclusive, not coercive. Id. Here, it is the Board of Commissioners, and the Board of Commissioners only, that tells the public to join in the prayer. What is more, these instructions are almost always from the Chairman. See, e.g., R. 10 (Am. Compl. ¶¶ 19-23) (Page ID #64-66). The Chairman presides over the meeting; his words are cloaked in procedural formality. The words “rise” and “assume a reverent position” from the Chairman, therefore, are not mere suggestions, they are commands. But even in the infrequent instances where it is the Commissioner giving the prayer who tells the public to “rise” or to “bow [their] head[s],” R. 29-1 (Pl. Resp. to Def. Mot. for Summ. J., Ex. E ¶¶ 9, 13, 22) (Page ID #370-71), the effect is the same: to coerce the public to participate in the exercise of religion.
This coercion is compounded by the setting in which it is exerted. See Town of Greece, 134 S.Ct. at 1825 (controlling opinion). Local government meetings are small and intimate. And unlike in federal and state legislative sessions, where the public does not speak to the legislative body except by invitation, citizens attend local government meetings to address issues immediately affecting their lives. Jackson County residents have gone to the Board of Commissioners’ monthly meetings to ask for funding for disabled students’ transportation to school, County of Jackson, June 18, 2013 Jackson County Board of Commissioners Meeting, YouTube (June 19, 2013), http://tinyurl.com/2013jun 19 (35:53-38:30), request repairs to roads leading to their homes or businesses, County of Jackson, July 23, 2013 Jackson County Board of Commissioners Meeting, YouTube (July 24, 2013), http://tinyurl. com/2015jul23 (24:58-30:19), and redress discrimination, County of Jackson, March 17, 2015 Jackson County Board of Commissioners Meeting, YouTube (Mar. 18, 2015), http://tinyurl.com/2015mar17c (5:27—7:42). Thus, there is increased pressure on Jackson County residents to follow the Board of Commissioners’ instructions at these meetings, as the residents would not want to offend the local government officials they are petitioning.
Moreover, as amicus Americans United points out, the Commissioners prayed at the beginning of their meetings only when members of the public were in attendance. The decision to pray only when members of the public were present indicates that the prayer was not directed at the Commissioners themselves, and that the purpose of the prayer was not to solemnize the proceedings for the Commissioners, but that the prayer was meant “to afford government an opportunity to proselytize or force truant constituents into the pews.” Town of Greece, 134 S.Ct. at 1825.
Second, the Board of Commissioners has singled out Bormuth for opprobrium. "When Bormuth objected to being forced to acknowledge Jesus Christ as God when he attended a government meeting to discuss environmental issues from a scientific and economic perspective, a Commissioner made a disgusted face and turned his back. County of Jackson, August 20, 2013 Jackson County Board of Commissioners Meeting, YouTube (Aug, 21, 2013), https:// tinyurl.com/yamjn47a (20:00-21:09); R. 10 (Am. Compl. ¶¶ 31) (Page ID #69). During a public meeting, a Commissioner stated that Bormuth’s lawsuit was an “attack on Christianity and Jesus Christ, period.” County of Jackson, Personnel & Finance Committee November 12, 2013 Jackson County, MI, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (32:50-32:59). Another Commissioner characterized Bormuth’s lawsuit as “political correctness nonsense” and complained that he has “had political correctness jammed down [his] throat.” Id. at 43:00-43:18. That Commissioner continued:
*542 The Federalist Papers, if you read them, tell[ ] me that it is your duty to disobey an illegal law. And it has taken some nitwit two hundred-and-some years to come up with an angle like this to try to deprive me or other people, of my faith, of my rights.
Id. at 43:22—43:41 (emphasis added). In disparaging Bormuth, the Board of Commissioners’ message is clear: residents who refuse to participate in the prayers are disfavored. Indeed, when Bormuth expressed his belief that the Board of Commissioners was violating the First Amendment during the public-comment period of the August 2013 meeting, one of the Commissioners made faces and then turned his back on Bormuth, refusing even to look at Bormuth while he spoke. R. 10 (Am. Compl. ¶ 31) (Page ID #69).
The majority brushes these comments aside, first saying that they were a reaction to Bormuth bringing “yet another lawsuit” against the County and “not to [Bor-muth’s] beliefs but to the litigious way he chose to express them.” Maj. Op. at 518. The majority also says that, in any event, “[t]he Establishment Clause ... does not require [government officials] to keep their cool.” Id. Neither of the majority’s statements is entirely accurate.
As for the claim that the Commissioners were reacting to Bormuth’s lawsuit, not his beliefs, the incident where a Commissioner turned his back on Bormuth and made a face occurred the fírst time Bormuth expressed any objection to the prayer practice, before he filed this lawsuit. The Commissioners certainly continued to express publicly their disdain for Bormuth after he filed this lawsuit, but because they began publicly expressing this disdain the very first time he objected to the prayer practice, it is misleading to downplay their comments as mere frustration at having to defend a lawsuit rather than animosity toward Bormuth, his beliefs, and his objection to Jackson County’s prayer practice. That “[t]his was not [Bormuth’s] first legal grievance, to put it mildly,” Concurrence at 524, is of no moment. Regardless of how “litigious” or “antagonizing]” Bqrmuth may be, Maj. Op. at 518, the fact is that government officials refused to listen to his objection, which he made during a Board of Commissioners meeting’s public comment period, to a prayer practice that systematically excluded minority religious views. The Commissioners also called Bor-muth disparaging names and called his views nonsense.
As for the majority’s view that “[t]he Establishment Clause ... does not require [government officials] to keep their cool,” the majority acknowledges that the Establishment Clause does prevent government officials from singling out religious minorities for opprobrium. Maj. Op. at 518; see Town of Greece, 134 S.Ct. at 1825 (“The analysis would be different if town board members ... singled out dissidents for opprobrium ... ”). The majority appears to argue that a Commissioner turning his back on Bormuth and refusing to listen to him say that Jackson County’s prayer practice disrespected non-Christian citizens is somehow distinct from singling him out for opprobrium. My only response is to ask the reader to imagine making an earnest, public plea to someone in a position of authority—a plea not about just any topic, but about a concern that the authority figure is disrespecting your religious beliefs, or disrespecting some value that you consider central to your life and perhaps definitive of who you are. You might not be troubled if the person told you that they disagreed with your concern, or if they listened but said nothing in response. But imagine if, instead of listening, they made a face of disgust and turned around, refusing to face you. Would you feel like *543 this government official had expressed “contempt or distaste usually mingled with reproach and an implication of inferiority”? Opprobrium, Merriam-Webster Unabridged Dictionary, http://unabridged. merriamwebster.com/unabridged/ opprobrium (last visited Aug. 16, 2017).
Third, Bormuth has submitted evidence suggesting that the Board of Commissioners has “allocated benefits and burdens based on participation in the prayer.” See Town of Greece, 134 S.Ct. at 1826 (controlling opinion). Shortly after Bormuth filed his complaint, Jackson County officials nominated members for the County’s new Solid Waste Planning Committee from a pool of applicants. R. 10 (Am. Compl. ¶ 33) (Page ID #69). Although Bormuth had three years of experience working on related issues, the Board of Commissioners did not nominate him. Id. Given that the Commissioners had publicly expressed their contempt for Bormuth, id. ¶ 31 (Page ID #69); see also R. 14 (Pl. First Mot. for Summ. J., Ex. C) (Page ID #149), the Board of Commissioners’ decision not to nominate him could easily be interpreted as a response to Bormuth’s refusal to participate in the prayers. Bormuth also sought to supplement the record with a letter he received from the Board of Commissioners denying him appointment to the Board of Public Works. R. 52 (Pl. Second Mot. to Suppl. Record at 1) (Page ID #932). Although Bormuth is confident that he was “the most qualified applicant,” the Board of Commissioners did not name him for the position. Id. ¶ 6 (Page ID #933). This rejection came just shy of a month after one of the Commissioners publicly called Bormuth a “nitwit.” See County of Jackson, Personnel & Finance Committee November 12, 2013 Jackson County, MI, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (43:22-43:41). Like the County’s decision not to nominate him to the Solid Waste Planning Committee, this decision suggests that the Board of Commissioners was denying benefits to residents based on their beliefs.
The majority wholly fails to reckon with the possibility that the Board of Commissioners may have denied Bormuth these committee positions because of his refusal to participate in the Christian prayers. Although the majority claims that it “assume[s] those facts not accepted by the district court,” it defends the Commissioners’ actions by arguing that “[a]ll we have are unverified assertions from [Bormuth’s] complaint,” that Bormuth “failed to put forth any evidence,” and that “there is nothing in the record” supporting Bor-muth’s allegations. Maj. Op. at 519 & n.13. The reason there is little information in the record about the Commissioners’ motivations is that the district court refused to allow Bormuth to depose any of the Commissioners. Had Bormuth been able to depose the Commissioners, he might have developed additional evidence that they denied him positions because of his refusal to pray. All the majority’s reasoning accomplishes is to underscore that the district court’s error in denying Bormuth’s discovery motions was not harmless.
Based on the facts before this court, I would hold that the Jackson County Board of Commissioners’ prayer practice violates the First Amendment’s Establishment Clause. Not only is the prayer practice well outside the tradition of historically tolerated prayer, but also it coerces Jackson County residents to support and participate in the exercise of religion. Whether or not there were already sufficient facts to hold that the Jackson County prayer practice is unconstitutional, I would allow Bormuth to conduct discovery to gather more information about the Commissioners’ purpose in opening their meetings with a prayer and in rejecting Bor- *544 muth’s applications for positions on county committees.
F. Conclusion
I conclude by underscoring two factual details about Jackson County’s prayer practice. First, the Jackson County Board of Commissioners affirmatively excluded non-Christian prayer givers, and did so in an effort to control the content of prayers. See County of Jackson, Personnel & Finance Committee November 12, 2013 Jackson County, MI, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (37:47-38:16). Second, Commissioners attempted to silence Bormuth and insulted him for criticizing their prayer practice. For example, when Bormuth voiced his concern about the prayer practice at a meeting, a Commissioner turned his chair around, refusing to listen to him. R. 10 (Am. Compl. at ¶ 31) (Page ID #69). One Commissioner said that Bormuth was “attacking ... my Lord and savior Jesus Christ.” R. 14 (Pl. First Mot. for Summ. J., Ex. C) (Page ID #149). Separately, a Commissioner referred to Bormuth as “a nitwit.” County of Jackson, Personnel & Finance Committee November 12, 2013 Jackson County, MI, YouTube (Dec. 19, 2013), http://tinyurl.com/ 2013nov12 (32:50-32:59, 43:00-43:18, 43:22—43:41).
These facts show how far Jackson County’s practice strays from the historically tolerated tradition of legislative prayer. In Town of Greece, the Supreme Court made clear that its decision about the Town of Greece’s prayer practice did not absolve courts of the duty to evaluate the constitutionality of factually distinguishable-prayer practices. Instead, it said that “[c]ourts remain free to review the pattern of prayers over time to determine whether they comport with the tradition of solemn, respectful prayer approved in Marsh, or whether coercion is a real and substantial likelihood.” Town of Greece, 134 S.Ct. at 1826-27. “If circumstances arise in which the pattern and practice of ceremonial, legislative prayer is alleged to be a means to coerce or intimidate others, the objection can be addressed in the regular course.” Id. at 1826; see also Marsh, 463 U.S. at 795, 103 S.Ct. 3330. Jackson County’s prayer practice gives rise to precisely those circumstances, but the majority neglects to address them.
In the closing paragraph of his concurrence in Town of Greece, Justice Alito explains the limits of Town of Greece’s holding. Town of Greece, 134 S.Ct. at 1834 (Alito, J., concurring). Justice Alito underscores the contrast between such obviously unconstitutional scenarios as “a litigant awaiting trial who is' asked by the presiding judge to rise for a Christian prayer, of an official at a polling place who conveys the expectation that citizens wishing to vote make the sign of the cross before casting their ballots,” and the scenario presented in Town of Greece, Id. In Town of Greece, the prayers were not invariably Christian, the town made clear that it would allow any interested resident to offer an invocation, and government officials themselves did not say the prayers or direct the public to. participate in prayers. Id. at 1829.
In the case-before us today, the majority is dangerously close to permitting exactly what Justice Alito said. Town of Greece obviously does not permit—government officials instructing citizens to participate- in sectarian prayer before commencing government proceedings. There is no daylight between polling place workers asking individuals to pray .before casting their ballots, as in Justice Alito’s example, and county commissioners asking individuals to . pray before participating in local government meetings, as actually happens in Jackson County. This similarity underscores why a *545 tradition that protects the Town of Greece’s right to open its meetings with solemn and respectful prayers, which was targeted at legislators and offered by clergy or volunteers from a variety of faith traditions, does not protect Jackson County’s policy to restrict its legislative prayer practice to government officials themselves asking the public to participate in exclusively Christian prayer. And certainly, a tradition of solemn and respectful prayers does not protect Jackson County’s engaging in a legislative prayer practice that entails Commissioners turning their chairs when a citizen attempts to voice his objection to the prayer practice, publicly deriding a citizen because he speaks out against the prayer practice, and denying committee positions to a citizen, because he will not participate in the prayer practice. For these reasons, I respectfully dissent,

. Amicus Americans United for Separation of Church and State, not Bormuth, argued that the Commissioners’ pattern of praying only at meetings that members of the public attended shows that the Commissioners directed the prayers at citizens, not at themselves. Although amicus made this argument rather than Bormuth, it should be considered for two reasons. First, the Supreme Court has held that it can consider arguments raised only by amicus. See Davis v. United States, 512 U.S. 452, 457 n.*, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) ("[W]e will consider arguments raised only in an amicus brief.”) (citing Teague v. Lane, 489 U.S. 288, 300, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)). If the Supreme Court considers arguments raised only by amicus, there is no reason this court should not do so as well. Second, Americans United’s argument is a more specific argument in support of Bormuth’s general claim that Jackson County's prayer practice violated the Establishment Clause. "Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.” Yee v. City of Escondido, 503 U.S. 519, 534, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992). And in a case, like this one, where a party is pro se, it makes all the more sense to consider arguments by amicus that refine the general arguments made by that party. See, e.g., McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)) ("[W]e read the pleadings of a pro se plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.’ ”). Regardless of whether the court considers this specific argument about Commissioners praying only at meetings that members of the public attend, it should consider the video evidence more generally.

. In fact, at oral argument during the panel stage of this case, counsel for the County stated that the official record includes all of the videos of the Board of Commissioners’ meetings.

. As discussed below, Bormuth is pro se, so we must construe his pleadings liberally.

. Moreover, DaimlerChrysler and Conlin v. Mortgage Electronic Registration Systems, Inc., 714 F.3d 355 (6th Cir. 2013), the published cases that the majority relies on, are cases in which an argument was not presented in the district court, not cases in which a *532 fact was not presented to the district court. They do not analyze judicial notice of facts or Federal Rule of Evidence 201. They are consequently not helpful in analyzing the apparent tension between Federal Rules of Evidence 201 and proper role of appellate courts.

. Because this is one of the Court’s more concrete statements, it is tempting to turn it into a test and apply it to the County’s prayer practice, as the County endeavored to do in its brief before the panel. See Appellee Br. at 23, 25. The Court’s statement, however, must be Viewed through the lens of Galloway and Stephens’s insistence that legislative prayers be ecumenical. In other words, the statement is limited to challenges based on content alone.

. Justice ' Kennedy’s plurality ■ opinion is the controlling opinion on the issue of coercion, as discussed more fully below.

. In Unan, which the majority relies on, we concluded that the plaintiffs "failed to comply not only with the formal requirements of Rule 56(d), but also its substance” by failing to object to the district court’s decision to hold discovery in abeyance and by conceding that they did not indicate who they would seek to depose or what documents they would request, 853 F.3d at 293. By contrast, Bormuth complied with the substance of Rule 56(d) by specifically indicating that he sought to depose the Jackson County Commissioners and to obtain documents related to the Resource Recovery Facility.

. There is no support for the proposition in Judge Sutton's concurrence that Bormuth should not be treated the same as other pro se litigants because the "insisted on not having an attorney, even when one was offered.” Concurrence at 524. I note that the concurrence cites no authority for this proposition, most likely because there is noné. I also note that this proposition is as ill-conceived as it is unsupported.

. The Supreme Court has instructed that “[wjhen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.’ ” Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). This court has held that " 'narrowest' opinion refers to the one which relies on the 'least' doctrinally ‘far-reaching-common ground’ among the Justices in the majority: it is the concurring opinion that offers' the least change to the law.” United States v. Cundiff, 555 F.3d 200, 209 (6th Cir. 2009). In Town of Greece, Justice Kennedy's opinion is the narrowest. Although Justice Thomas’s conception of coercion is more restrictive, Justice Kennedy’s conception of coercion “offers the least change to the law.” Cundiff, 555 F.3d at 209. There is controlling precedent supporting Justice Kennedy's opinion and no controlling precedent supporting Justice Thomas’s concurrence. Justice Thomas's concurrence is neither the "the least doctrinálly far-reaching-common ground among the Justices in the majority,” nor the “opinion that offers the least change to the law.” Cundiff, 555 F.3d at 209 (internal quotation marks omitted). And when viewed within the context of the Court’s holding, Justice Kennedy’s opinion clearly represents the narrowest grounds. The Court's holding was that there was no coercion. According to Justice Kennedy, this was because there was no coercion in the record. According to Justice Thomas, this was because there could never be coercion absent formal legal compulsion. Within the context of a ruling against the respondents, therefore, the narrower opinion is Justice Kennedy’s, not Justice Thomas’s. Accordingly, Justice Kennedy's conception of coercion is the holding of the Court.